UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARYANNE DAUER, DEBORA COLE
AND JOAN PUCINO,

                                    Plaintiffs,

                -against-

VERIZON COMMUNICATIONS INC.,

                                    Defendant.

**MEMORANDUM OPINION
AND ORDER**

03 Civ. 05047 (PGG)

PAUL G. GARDEPHE, U.S.D.J.

         Plaintiffs Maryanne Dauer ("Dauer") and Joan Pucino ("Pucino") were

employed by Defendant Verizon Communications Inc. ("Verizon") or its predecessor

companies as field technicians.  Plaintiffs claim that beginning in the mid-1990s, Verizon

subjected them to disparate treatment and a hostile work environment because of their

sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title

VII"), and the New York State Human Rights Law, New York Executive Law § 296

("NYSHRL").  In addition, they claim that Verizon retaliated against them in violation of

Title VII and the NYSHRL.  Verizon has moved for summary judgment on all of

Plaintiffs' claims.  For the reasons stated below, Verizon's motion for summary judgment

against Dauer (Docket No. 27) is GRANTED and Verizon's motion for summary

judgment against Pucino (Docket No. 24) is GRANTED.[1]

_____

[1] Verizon's motion for summary judgment concerning Debora Cole's claims was granted
in a January 6, 2009 order.  (Docket No. 81)

## DISCUSSION

**A.      Summary Judgment Standards**

Summary judgment is warranted only if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation omitted).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat summary judgment.  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58,

67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

The Court is mindful that "direct evidence of . . . [discriminatory] intent will only rarely be available, so . . . 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Holcomb, 521 F.3d at 137 (internal citation omitted) ("We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.").  However, the Court must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Bickerstaff, 196 F.3d at 448.

As is routine in this Circuit, the Court will treat Plaintiffs' claims under Title VII and the NYSHRL "as analytically identical, applying the same standard of proof to both claims," except with respect to the question of whether any claims are time-barred.  Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 226 n.9 (2d Cir. 2008) (considering sex discrimination claims); see also Schiano v. Quality Payroll Sys., 445

F.3d 597, 609 (2d Cir. 2006) (hostile work environment and retaliation claims are subject

to the same standards under federal and New York state law).

**B.      Timeliness of Plaintiffs' Claims**

Verizon asserts in passing that a number of Plaintiffs' claims are time-

barred.  Verizon "bear[s] the burden of proving the affirmative defense of statute of

limitations," and can prevail on this ground only if it "provide[s] specific information"

that the claim arose outside the relevant time period.  Constance v. Pepsi Bottling Co. of

NY, No. 03-Civ.-5009(CBA)(MDG), 2007 WL 2460688, at *13 (E.D.N.Y. Aug. 24,

2007) (considering timeliness of NYSHRL discrimination claim); see also D'Antonio v.

Metro. Transp. Auth., No. 06-Civ.-4283(KMW), 2008 WL 582354, at *9 (S.D.N.Y.

March 4, 2008) ("The statute of limitations is normally an affirmative defense, on which

the defendant has the burden of proof." (internal quotation omitted)); Katt v. City of New

York, 151 F. Supp. 2d 313, 348 (S.D.N.Y. 2001) (holding in sexual harassment case that

it was defendants' burden to prove that "no incidents of . . . harassment occurred during

the limitations period").

To recover under Title VII for an alleged act of disparate treatment or

retaliation, a plaintiff must file a charge with the EEOC within 300 days after the day the

alleged act happened.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002);

see also Petrosino v. Bell Atl., 385 F.3d 210, 220 (2d Cir. 2004).  An EEOC charge is

deemed filed on the day it is received by the EEOC.  See Tewksbury v. Ottaway

Newspapers, 192 F.3d 322, 326-28 (2d Cir. 1999) (considering issue with respect to

claim governed by 42 U.S.C. § 2000e-5(c), which applies to Title VII claims).  In this

case, the EEOC charge was date-stamped by the EEOC on March 30, 2001.  (Def. Dauer

Ex. 47; Def. Pucino Ex. 14)  Therefore, Plaintiffs may recover under Title VII with respect to discrete discriminatory or retaliatory acts that occurred after June 4, 2000.[2]

        To recover for discrete acts of disparate treatment or retaliation under the NYSHRL, a plaintiff must sue within three years of the date of the act.  Bonner v. Guccione, 178 F.3d 581, 584 (2d Cir. 1999).  However, the statute of limitations is tolled for the period between the filing and denial of a plaintiff's EEOC charge.  Siddiqi v. New York City Health & Hosp. Corp., 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008).  Here, Defendant maintains, and Plaintiffs do not dispute, that Plaintiffs' state law claims are timely as to alleged acts that occurred within the three years prior to when Plaintiffs filed their EEOC charge.  (Def. Pucino Br. at 8 n.8; Def. Dauer Br. at 8 n.4).  Therefore, for purposes of this motion, the Court will consider Plaintiffs' state law claims timely insofar as they relate to discrete discriminatory or retaliatory acts that occurred after March 30, 1998.

        For statute of limitations purposes, a hostile work environment claim is treated differently from a disparate treatment claim because it "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Morgan, 536 U.S. at 117.  Thus, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id.; see also Petrosino, 385 F.3d at 220

---

[2]  The parties appear to contend that Plaintiffs' EEOC charge is considered filed either on the date Plaintiffs mailed it or on the date Verizon received a copy of it.  See, e.g., Rule 56.1 Stat. (JP) ¶ 52 (asserting that charge was filed on April 23, 2001); Rule 56.1 Answer (JP) ¶ 52 (admitting charge was filed on April 23, 2001); Rule 56.1 Answer (MD) ¶ 46 ("Plaintiffs filed their EEOC complaint in or about March 26, 2001").  Neither side explains its position, and the Court will therefore use the date that appears to be correct based on the evidence in the record, i.e., March 30, 2001.

(same).  "In order for the charge to be timely, the employee need only file a charge within

. . . 300 days of any act that is part of the hostile work environment."  <u>Morgan</u>, 536 U.S.

at 118.  Therefore, if any of the acts contributing to Plaintiffs' hostile work environment

claims occurred within the time periods described above, the Court will consider all acts

that are "part of the same actionable hostile work environment practice," regardless of

whether they "fall[] within the statutory time period," in deciding Plaintiffs' hostile work

environment claims.  <u>Id.</u> at 120; <u>see also</u> <u>Patterson v. County of Oneida</u>, 375 F.3d 206,

220 (2d Cir. 2004).

## SUMMARY JUDGMENT MOTION CONCERNING DAUER

From 1995 through July 2001, Dauer was a field technician based at

Defendant's Pierce's Road garage in Newburgh, New York.  (Rule 56.1 Stat. (MD) ¶¶ 2,

4)[3]  In July 2001, Dauer was transferred to the Installation & Repair Department at

Defendant's Union Avenue garage in Newburgh, New York.  (<u>Id.</u> ¶ 5)

Dauer claims that Defendant discriminated against her on the basis of her

sex by:

    (1)    failing to provide her with a permanent bucket truck assignment and assigning an older bucket truck to her (Cmplt. ¶ 14; Pltf. Br. at 2-4);

    (2)    assigning her to perform "two-man" jobs alone and instructing her co-workers not to assist her (Cmplt. ¶¶ 15-17; Pltf. Br. at 5-6);

    (3)    failing to provide a women-only bathroom and reprimanding her for using offsite bathrooms (Cmplt. ¶ 20; Pltf. Br. at 13-14);

---

[3]  The cited statements of fact from Defendant's Rule 56.1 Statements are admitted in corresponding paragraphs of Plaintiffs' respective responses to Defendant's Rule 56.1 Statements.  The Rule 56.1 Statement filed by Defendant with respect to Dauer is cited as "Rule 56.1 Stat. (MD)" and the Rule 56.1 Statement filed by Defendant with respect to Pucino is cited as "Rule 56.1 Stat. (JP)."

(4)     criticizing her work (Cmplt. ¶ 16; Pltf. Br. at 8);

(5)     denying her light duty work (Cmplt. ¶ 19; Pltf. Br. at 11); and

(6)     denying her pay for time off (Cmplt. ¶ 18; Pltf. Br. at 10).

In addition to asserting disparate treatment claims based on the above conduct, Dauer makes a hostile work environment claim and contends that Verizon unlawfully retaliated against her by "subject[ing] her to . . . hostility, micro management and unjust scrutiny." (Cmplt. ¶¶ 24-26)[4]

**A.     Dauer's Disparate Treatment Claims**

     **1.     Applicable Standards**

The framework for analyzing Title VII cases is well established:

[Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), . . . the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb, 521 F.3d at 138 (citations omitted).

---

[4]  Dauer also raised a number of claims at her deposition and in her brief opposing summary judgment that she did not allege in the EEOC charge or in the Complaint. Despite having ample time to do so, Dauer has never sought to amend the Complaint to include these claims.  As discussed further below (infra pp. 25-28), Dauer may not now assert these claims as stand-alone disparate treatment or retaliation claims.  However, the Court will consider all of Dauer's evidence in determining whether she has offered sufficient evidence to proceed to trial on her hostile work environment claim.

Here, Verizon argues that Dauer's disparate treatment claim should be dismissed solely because she has not established a prima facie case of discrimination. (Def. Br. at 7-8)  The plaintiff's burden in establishing a prima facie case "'is not onerous'" – indeed, it is "<u>de minimis</u>," <u>Beyer</u>, 524 F.3d at 163 – and is satisfied by "evidence that raises a reasonable inference that the action taken by an employer was based on an impermissible factor." <u>Holcomb</u>, 521 F.3d at 138 (quoting <u>Burdine</u>, 450 U.S. at 253).  While a low standard applies to the prima facie case determination, "a plaintiff's case must fail if she cannot carry this preliminary burden." <u>Beyer</u>, 524 F.3d at 163.

To establish a prima facie case, Dauer must show:  "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Holcomb</u>, 521 F.3d at 138.  Verizon asserts that Dauer cannot establish the third and fourth elements of this test.  (Def. Br. at 8-17)

To show that she suffered an adverse employment action, Dauer must offer evidence from which a jury could find that the complained-of act "'created a materially significant disadvantage' in . . . [her] working conditions." <u>Beyer</u>, 524 F.3d at 164 (quoting <u>Williams v. R.H. Donnelley Corp.</u>, 368 F.3d 123, 128 (2d Cir. 2004)). Where the complained-of action caused "mere inconvenience," it does not constitute an adverse employment action.  <u>Sanders v. New York City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004) ("[t]o be materially adverse, . . . [the] change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job

8

responsibilities'"). Moreover, Dauer must "proffer objective indicia of material disadvantage." Beyer, 524 F.3d at 164. She cannot show that she suffered an adverse employment action merely by pointing to her "subjective, personal disappointment[]." Id. (internal quotation omitted).

    To establish the fourth element of her prima facie case, Dauer must show that any adverse employment action occurred in circumstances giving rise to an inference of discrimination. A plaintiff may do so by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). To raise an inference of discrimination, Dauer must "'show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" Id. (internal quotation omitted). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Id. However, the plaintiff must at least "provide 'an objectively identifiable basis for comparability' between herself and other employees." Goldman v. Admin. for Children's Serv., No. 04-Civ.-7890(GEL), 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007). Conclusory statements that "similarly situated" employees outside the protected class were treated more favorably are not sufficient to defeat summary judgment. See, e.g., id. at **7-8; Chan v. NYU Downtown Hosp., No. 03-Civ.-3003(RMB), 2006 WL 345853, at **5-6 (S.D.N.Y. Feb. 14, 2006) (plaintiff's conclusory statements that Caucasian employees were treated differently were insufficient to make out prima facie case of race discrimination because plaintiff did not "identify any similarly situated individuals outside her protected class who were treated preferentially"); Abato v. New York City Off-Track Betting Corp., No. 03-Civ.-

5849(LTS), 2007 WL 1659197, at *6 (S.D.N.Y. June 7, 2007) (conclusory statements that "similarly situated younger women" were treated differently, in the absence of any "specific information" concerning those individuals, were "insufficient to present a genuine issue of material fact").

For the reasons stated below, Dauer has not offered evidence from which a reasonable jury could find that she suffered an adverse employment action in circumstances giving rise to an inference of discrimination, and Verizon is therefore entitled to summary judgment on her disparate treatment claims.

## 2.  **The Bucket Truck Claim**

Dauer's strongest disparate treatment claim is that Defendant discriminated against her by denying her access to a bucket truck after she was transferred to the Installation & Repair department in July 2001.  (Cmplt. ¶ 14; Pltf. Br. at 2-4; Dauer Dep. 96:11-97:3)  However, Dauer has not offered sufficient "concrete particulars," Bickerstaff, 196 F.3d at 451-52, for a jury to find that Defendant's alleged conduct with respect to assigning bucket trucks "created a materially significant disadvantage in . . . [her] working conditions," Beyer, 524 F.3d at 164 (internal quotation omitted), and she therefore has not established a prima facie case of discrimination with respect to this claim.

### a.  **Facts**

Field technicians are often required to work on equipment located at the top of utility poles.  They reach these locations using bucket trucks or 24- to 28-foot ladders.  (Rule 56.1 Stat. (MD) ¶ 7; Pucino Aff. ¶ 14)  A bucket truck is a large pick-up truck that contains an arm with an enclosed platform.  (Pucino Aff. ¶ 13)  A hydraulic lift in the truck raises the platform so that the field technician can reach wires.  (Id.)

"Because of their desirability, [Verizon] assigned bucket trucks on the basis of seniority."  (Pucino Aff. ¶ 17)  Some field technicians had permanent bucket truck assignments, while others were assigned vans with ladders.  (Rule 56.1 Stat. (MD) ¶ 7)  Bucket trucks offer "increased safety and efficiency" over vans and ladders.  (Dauer Aff. ¶ 23; see also Pucino Aff. ¶ 16 ("Bucket trucks are more desirable because they are safer, easier to use and able to reach higher."))  A van and ladder are suitable for performing the field technician job "[m]ost of the time," but there are times when "a van [i]s not sufficient" – for instance, "[w]hen the 28 foot ladder wouldn't reach the job you had to do" or "[w]hen it required something that you weren't able to carry up on a ladder that was too heavy."  (Pucino Dep. 106:19-107:7)

Dauer had a permanent bucket truck assignment from late 1996 or early 1997 through July 2001.  (Rule 56.1 Stat. (MD) ¶ 8)  When Dauer was transferred to the Installation & Repair department at the Union Avenue garage in July 2001, however, she did not have sufficient seniority in the new garage to keep her bucket truck assignment. (Rule 56.1 Stat. (MD) ¶¶ 14, 16)  Supervisor Justin Hinspeter "took away [her] truck" and assigned it to a male employee with more seniority.  (Dauer Aff. ¶¶ 19-20)  Hinspeter told her that this happened because of her "lack of seniority."  (Id. ¶ 21)  In contrast, a male employee with three weeks' more seniority than Dauer – who was transferred to the Union Avenue garage at the same time – was allowed to keep his truck, even though there were male employees in the garage with greater seniority who did not have a truck. (Id.)  Some Verizon female technicians did have permanent bucket truck assignments during this time, however.  (Rule 56.1 Stat. (MD) ¶ 11)

After her transfer in July 2001, Dauer was assigned a van with a ladder, as were some male technicians at the Union Avenue garage.  (Id. ¶ 9)  "Because of [her] back injury and the increased safety and efficiency of a bucket truck," however, she "frequently" requested a bucket truck.  (Dauer Aff. ¶ 23)  About 50% of the time, Dauer's request was granted.  (Rule 56.1 Stat. (MD) ¶ 10; Dauer Aff. ¶ 24)  Dauer claims that she was sometimes denied a bucket truck when trucks were available, however, and when she and a less senior male employee both requested a truck, it was "often" provided only to the male employee.  (Dauer Aff. ¶¶ 24-25)

For example, on November 26, 2001, Dauer requested a bucket truck because of wet conditions.  (Id. ¶ 26)  She was told that no truck was available, but when she returned to the garage later that morning, she saw several unassigned trucks parked at the garage.  (Id. ¶¶ 27, 29)  While working that day with her van and ladder, she fell carrying the ladder and re-injured her back, which caused her to lose approximately three weeks of work.  (Id. ¶¶ 28-29)

### b.       Dauer Did Not Suffer an Adverse Employment Action

The key issue with respect to this claim is whether Dauer has offered sufficient concrete evidence for a reasonable jury to find that Defendant's denial of a bucket truck – approximately 50% of the time Dauer requested one – a constitutes an adverse employment action.

As an initial matter, the Court rejects Defendant's argument that "truck and van assignments simply do not constitute adverse employment actions." [5]  (Def. Br.

_____

[5]  The two cases Defendant cites are not on point.  See Rhodes v. Illinois Dep't of Transportation, 243 F. Supp. 2d 810, 818 (N.D. Ill. 2003) (finding that a supervisor's refusal to allow the plaintiff to drive a "Lead Worker's truck" was not an adverse

at 9-10)  Where a refusal to provide equipment significantly interferes with or precludes job performance, or creates "unreasonably dangerous" conditions, such conduct can constitute an adverse employment action.  See, e.g., Edwards v. Metro-North Commuter R.R. Co., No. 04-Civ.-1430(JBA), 2006 WL 2790402, at *5 (D. Conn. Sept. 27, 2006) (holding that employer's failure to provide employee with certain protective equipment could be an adverse employment action because it exposed employee to "potentially unreasonably dangerous working conditions"); Ward-Schumann v. Mediacom Commc'ns Corp., No. 05-Civ.-84, 2006 WL 2460819, at *3 (W.D. Ky. Aug. 24, 2006) (holding that employer's failure to provide plaintiff with a company truck, which prevented plaintiff from performing one aspect of job and required plaintiff to bear increased costs, constituted adverse employment action); Keefer v. Universal Forest Prods., Inc., 73 F. Supp. 2d 1053, 1057 & n.5 (W.D. Mo. 1999) (stating that "[t]he outright failure to provide admittedly required safety equipment would create materially significant disadvantage," but finding that equipment provided to plaintiff was adequate).  See also Gawley v. Indiana Univ., 276 F.3d 301, 316 n.9 (7th Cir. 2001) (noting in discrimination/ constructive discharge case that an employee "might have a cognizable claim" if she "could show that the employer delayed the issuance of critical safety equipment on the basis of gender or race," but finding that no such showing had been made); Freedman v.

_____

employment action because it amounted to no more than "[a] temporary assignment of undesirable duties" that were within the plaintiff's job description); Carl v. Parmely, 188 F. Supp. 2d 991, 1004-05 (S.D. Ill. 2001) (holding that the plaintiff could not show that she had suffered an adverse employment action based on the assignment of undesirable job duties if the duties were within her job description).  Here, all of Dauer's duties required either a bucket truck or a van and ladder.  Therefore, the issue is not whether Dauer was required to perform undesirable duties, but whether Dauer was provided with the equipment necessary to do her job.

MCI Telecomm. Corp., 255 F.3d 840, 847 (D.C. Cir. 2001) (in deciding whether alleged failure to provide tools was adverse employment action, considering degree of "interference with . . . [plaintiff's] work," and finding no adverse employment action where interference was "minimal").

Conversely, where the equipment at issue is more desirable, but the job can be performed without it, courts have found that the failure to provide the desired equipment does not constitute an adverse employment action.  See, e.g., Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006) (holding that assignment of a Jeep rather than a Ford was not an adverse employment action); Lee v. Healthfirst, Inc., No. 04-Civ.-8787(THK), 2007 WL 634445, at *14 (S.D.N.Y. March 1, 2007) (assignment of older model of car and cell phone was not an adverse employment action); Wells-Williams v. Kingsboro Psychiatric Center, No. 03-Civ.-134(CBA), 2007 WL 1011545, at *3 (E.D.N.Y. March 30, 2007) (assignment of adequate but less desirable kitchen knives to chef was a "mere inconvenience," not an adverse employment action).

Here, while Dauer has testified in a conclusory fashion that her job could be performed more easily and safely with a bucket truck than with a van and ladder, she has not proffered evidence from which a jury could find that she was actually refused a bucket truck in situations where the refusal significantly interfered with her ability to perform her job or made her job unreasonably dangerous.

With respect to safety, Dauer has only offered her conclusory testimony that bucket trucks offer "increased safety" over vans and ladders.  (Dauer Aff. ¶ 23)  She has also described one instance in which she slipped while carrying a ladder and injured her back.  (Id. ¶¶ 26-29)  However, no reasonable jury could find based on this testimony

that Dauer's job was "unreasonably dangerous" without a bucket truck, particularly given undisputed evidence that both men and women routinely used vans and ladders to perform the field technician job and that there was no requirement that bucket trucks be provided to employees with Dauer's duties.[6]   (See, e.g., Rule 56.1 Stat. (MD) ¶ 7 (some field technicians had permanent van/ladder assignments); Dauer Aff. ¶¶ 19-21 (in July 2001, there were male field technicians at the Union Avenue garage with more seniority than Dauer who did not have permanent bucket truck assignments); Dauer Dep. 37:10-13)  Thus, this is not a case where an employee was denied equipment that was necessary to make a job safe to perform.

Similarly, although Dauer offered proof suggesting that some jobs were more difficult to perform without a bucket truck (see Pucino Dep. 106:19-107:7), she has not offered evidence that she was ever denied access to a bucket truck on an occasion when a truck was available and would have made her job significantly easier.  Dauer has admitted that she received a bucket truck approximately 50% of the time when she requested one (Rule 56.1 Stat. (MD) ¶ 10; Dauer Aff. ¶ 24), and there is no factual basis for a jury to infer that when she was denied a truck, that denial made her job impossible or even materially more difficult to perform.

---

[6]  Indeed, Dauer testified that the only reason she felt she needed a bucket truck was because she had suffered a back injury in 1994.  (Dauer Dep. 37:19-22, 38:7-11 (testifying that a bucket truck was required for someone "[i]n [her] situation," i.e., who "had a back injury in 1994")).  Dauer has not offered any concrete particulars concerning her back injury, however, or any evidence about how that injury affected her during the post-July 2001 time period at issue here, that might allow a jury to find that a bucket truck was necessary for her to perform the field technician job safely.  In any event, Dauer must "proffer objective indicia of material disadvantage," Beyer, 524 F.3d at 164, and not rely solely on her individual circumstances in demonstrating that denying her a bucket truck 50% of the time that she requested one constitutes an adverse employment action.

Dauer's conclusory assertions concerning the "increased safety and efficiency" of bucket trucks are inadequate to create a genuine factual dispute as to whether Defendant's refusal to provide bucket trucks was a "materially significant disadvantage in . . . [her] working conditions."  Beyer, 524 F.3d at 164 (internal quotation omitted).  Dauer simply has not offered enough "concrete particulars" to allow a jury to find that she suffered an adverse employment action when she was denied use of a bucket truck.  See Bickerstaff, 196 F.3d at 451-52 (plaintiff must offer "concrete particulars" to defeat summary judgment); Meiri, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").  Therefore, Defendant is entitled to summary judgment on this claim.[7]

### 3.      Failure to Provide Assistance

Dauer also claims that her supervisors treated her less favorably than similarly situated male employees with respect to providing assistance.  Specifically, she alleges that her supervisors instructed her male co-workers not to assist her; that her supervisors "refused assistance" to her "that was given to similarly-situated males"; and that she was "assigned to perform tasks alone that similarly-situated males performed in pairs."  (Cmplt. ¶¶ 15-17)  Dauer has not established a prima facie case with respect to this claim, however, because she has not offered any evidence that she was actually

---

[7]  Dauer also claims that Verizon discriminated against her by assigning her an older bucket truck prior to July 2001.  (Pltf. Br. at 3)  For the same reasons that the failure to provide any bucket truck at all does not constitute an adverse employment action in the circumstances here, the failure to provide a better bucket truck also does not constitute an adverse employment action.

denied assistance in a situation where she required it, and therefore no reasonable jury could find that she suffered an adverse employment action.

        a.          **Dauer's Requests for Assistance**

Dauer states that between June and September 2000, "when [she] asked for assistance," her supervisor Dave Dodaro "challenged [her] repeatedly and asked [her] to justify [her] request," while "[s]imilarly-situated males who made such a request were granted it without challenge." (Dauer Aff. ¶ 34)

Dauer does not offer evidence that Dodaro actually refused her requests, however. Assuming that Dauer was required to justify her requests for assistance, there is no basis for a jury to find that she suffered anything more than an "inconvenience." Sanders, 361 F.3d at 755. Dauer has not alleged that there was ever a circumstance in which she could not perform her job because of a lack of assistance, nor does she even explain the nature of the assistance she sought or why it was necessary or preferable. In sum, Dauer has not shown that she suffered an adverse employment action arising from her supervisor's alleged demands that she justify her requests for assistance.

Moreover, Dauer has not offered specific evidence going to the fourth element of her prima facie case – i.e., that the circumstances here could give rise to an inference of discrimination. Her conclusory statement that similarly-situated males were treated differently, standing alone, is insufficient to meet her burden. See Bickerstaff, 196 F.3d at 451-52 (plaintiff must offer "concrete particulars" to defeat summary judgment); Chan, 2006 WL 345853, at **5-6 (conclusory statements that similarly situated individuals outside plaintiff's protected class were treated preferentially insufficient to defeat summary judgment); Abato, 2007 WL 1659197, at *6 (same).

17

b.        <u>Assignments To Work Alone in "Two-Man" Areas</u>

Dauer states that beginning in July 2001, she was "told to go to the job alone and call if [she] needed help" at least once per week in areas that had high crime rates, whereas her male colleagues "did not perform work in these areas unaccompanied." (Dauer Aff. ¶¶ 36-38)  When asked to explain this claim at her deposition, Dauer testified that "[t]here may have been one or two occasions on my part where I was asked many questions about why I needed a second person but that complaint [about being asked to perform tasks alone] refers more to [Plaintiff] Joan [Pucino] than to me."  (Dauer Dep. 109)  Dauer later supplemented this testimony by stating that she was asked to justify a request for a second person more than ten times, but she did not know how many more times.  (Dauer Dep. 110)  Dauer could only recall one instance where she actually went alone to a location that she felt required backup, and in that case backup was provided after she requested it.  (Dauer Dep. 111-15)

As with the assistance claims described above, it is clear from Dauer's testimony that her complaint is that she had to request assistance – not that she was actually denied assistance.  Dauer has likewise not offered any specific evidence supporting her conclusory assertion that similarly situated male colleagues were not required to request assistance or justify requests for assistance.  Therefore, for the same reasons stated above (<u>supra</u> p. 17), Dauer has not established the third or fourth elements of her prima facie case with respect to this aspect of her assistance claim.[8]

---

[8]  In support of this claim, Dauer states that several co-workers told her that they had been instructed not to assist her (Dauer Aff. ¶¶ 42-43), and that she "got the impression that many of the men were not willing to help when help was needed."  (Dauer Dep. 204:9-14)  Even if this evidence were not inadmissible as hearsay and subjective impression, Dauer's prima facie case would still fail because she has no evidence that she

4.      **Bathrooms**

Dauer claims that Verizon discriminated against her by failing to provide a women's bathroom.  (Pltf. Br. at 13-15)  At her deposition, Dauer made clear that her complaint is not the lack of sex segregation per se, but that at times her male co-workers would not lock the door while they were in the restroom, and also failed to respond to her knocks.  (Dauer Dep. 188:3-189:3)

In her affidavit, Dauer states that there was only one bathroom at Defendant's Beacon Central Office and that she "suffered . . . indignities" when she "inadvertently walked in on men using the restroom."  (Dauer Aff. ¶ 9)  Dauer recalls this happening three times between June 2000 and September 2000.  (Dauer Dep. 189:4-20; see also id. 177:7-13 (testifying that there were "several occasions" where she entered the bathroom and could tell that someone else was in a stall, and was "rather embarrassed")  Because of her dissatisfaction with the bathroom facilities, Dauer began driving to Verizon's Fishkill Central Office, which did have sex-segregated restrooms.  Dauer's supervisor also told her that she could "use restrooms in gas stations or restaurants." (Dauer Aff. ¶¶ 10-12)  Dauer was nonetheless "fearful of reprimand" and "documented [her] bathroom breaks on [her] timesheet."  (Id. ¶ 13)

This evidence cannot support a disparate treatment claim.  As explained in this Court's January 26, 2009 Order dismissing Cole's claims, an employer's failure to

was actually denied necessary assistance.  See Katz v. Beth Israel Med. Ctr., No. 95-Civ.-7183(AGS), 2001 WL 11064, at *10 (S.D.N.Y. Jan. 4, 2001) (dismissing claim supported only by plaintiff's testimony that co-workers told her that they were instructed not to assist her); Littman v. Firestone Tire & Rubber Co., 709 F. Supp. 461, 466 (S.D.N.Y. 1989) (plaintiff's "subjective impressions" were not sufficient to defeat summary judgment).

provide same-sex bathrooms is not an adverse employment action.  January 26, 2009 Order at 6 n.3.[9]  While Dauer's claim differs from Cole's in that she has offered some evidence that she inadvertently walked in on men approximately three times, this difference is not enough to salvage Dauer's claim.  Dauer has offered no case law or evidence to support an argument that these few instances of potential embarrassment had a material impact on her working conditions.  She also has not offered any evidence that the alleged failure of her male co-workers to respond to her knocking on the door was foreseeable, and there is thus no factual basis for a jury to infer discriminatory intent.

Moreover, Dauer was allowed to use bathrooms in other locations if she preferred.  (Dauer Aff. ¶ 12)  Her alleged and apparently unfounded fear of reprimand for doing so cannot support a Title VII discrimination claim.  See Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) (holding that even actual reprimands do not constitute adverse employment actions in the absence of other negative consequences).  Dauer has not presented evidence from which a jury could find that the bathroom facilities caused her anything more than inconvenience or that the circumstances give rise to an inference of discrimination, and she therefore has not established a prima facie case of discrimination with respect to this claim.

_____

[9]  See Macklin v. Am. Sugar Refining, Inc., No. 06-Civ.-2567, 2007 WL 2815984, at *1 (D. Md. Sep. 26, 2007) (defendant's provision of a unisex bathroom that plaintiff believed to be "substandard and unclean" did not constitute disparate treatment); Brinkley v. City of Green Bay, 392 F. Supp. 2d 1052, 1060 (E.D. Wis. 2005) (noting lack of authority to support plaintiff's argument that the failure to provide bathrooms "dedicated to only one sex" is "in itself . . . a violation of federal law"); Alseth v. Douglas County, No. 99-Civ.-627, 2000 WL 34230127, at *10 (W.D. Wis. June 23, 2000) (employer's conversion of the women's restroom into a unisex bathroom was not an adverse employment action; "sharing a bathroom with men" is "too trivial to constitute adverse employment action").

5.      **Criticism and Supervision**

Dauer claims that she was subjected to unlawful disparate treatment in that her supervisors criticized her and "micro-manage[d]" her on several occasions between June 2000 and the summer of 2001, but did not treat similarly situated male employees the same way.  (Pltf. Br. at 8)

Dauer testified that she was criticized by two supervisors, Dave Dodaro and Justin Hinspeter, for not meeting her repair quotas.  (Dauer Dep. 132:11-20, 162:17-25)  Dauer also testified that "a couple" of times she felt Hinspeter unfairly criticized her for taking too long to do a "no access" job, although she could only remember one such incident specifically.  (Id. 165:15-166:25, 173:21-174:18)  Dauer also felt Hinspeter treated her differently by "publicly summon[ing]" her to his office to receive the criticism rather than "speaking privately" to her.  (Rule 56.1 Stat. (MD) ¶ 35)

As to the alleged micro-management, Dauer testified that Dave Dodaro "follow[ed] [her] around on [her] job," and that her male co-workers told her that Dodaro did not visit their job sites.  (Dauer Dep. 332:7-11; Dauer Aff. ¶ 45)  Dauer does not identify specific occasions on which this happened, except for a September 2000 incident in which Dodaro was waiting for her at a job site when she arrived and criticized her for not being there.  (Dauer Aff. ¶¶ 43-44)

Dauer's evidence is not sufficient for a jury to find that she suffered an adverse employment action.  "[C]ourts in this circuit have found that reprimands . . . and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation," and Dauer offers no evidence of such negative results here.  Uddin, 427 F. Supp. 2d at 429 (quoting Honey

21

v. County of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)); see also Weeks v.
New York State, 273 F.3d 76, 86 (2d Cir. 2001) ("[i]t hardly needs saying that a criticism
of an employee . . . is not an adverse employment action" where there is no evidence that
the criticism had any negative ramifications for the employee), abrogated on other
grounds, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Hill v. Rayboy-
Brauestein, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) ("micro-management" and
"excessive scrutiny" were not adverse employment actions, particularly where plaintiff's
only evidence of disparate treatment was "her own perception that she was treated
differently"); Figueroa v. City of New York, 198 F. Supp. 2d 555, 568 (S.D.N.Y. 2002)
("Being followed by supervisors is not a materially adverse employment action."); 
Morrison v. Potter, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005) ("being called into
supervisor's office to discuss work issues" is not an adverse employment action, even if it
causes the employee embarrassment or anxiety).

Dauer also does not offer anything more than conclusory allegations and
"her own perception that she was treated differently," Hill, 467 F. Supp. 2d at 355, to
show that males were treated more favorably.  Dauer admits that she does not know
whether her male co-workers who failed to meet their quotas were also criticized (Rule
56.1 Stat. (MD) ¶ 36; Rule 56.1 Answer (MD) ¶¶ 35-36), and agrees that her basis for
believing that she was subjected to gender discrimination is that she "felt [she] was called
into the office more times than the males were and talked to about [her] production."
(Dauer Dep. 164:10-16)  She further testified that she does not know whether Hinspeter
ever spoke to male employees about taking too long with their assignments (id. 171:17-
20), but believes that others took similar amounts of time based on her discussions with

22

unspecified male employees and her observation of male employees' timesheets.  (Id. 171-20-173:20)  This limited evidence, which appears to be based only on Dauer's suspicions and impressions, does not provide a factual basis for a jury to find that she was treated differently from similarly situated male employees, and therefore is insufficient to establish the fourth element of her prima facie case.  Hill, 467 F. Supp. 2d at 356-57; Chan, 2006 WL 345853, at **5-6; Abato, 2007 WL 1659197, at *6.

### 6.   **Denial of Light Duty Work**

In her affidavit, Dauer states that she was "often denied light duty assignments" while "similarly-situated men, including Walt Doyle, received light duty assignments."  (Dauer Aff. ¶ 56)  However, she identifies only one specific occasion when she was denied light duty:  December 2002.[10]  (Pltf. Rule 56.1 Stat. ¶ 43; Pltf. Br. at 11)  Dauer has not offered evidence that any specific male employee (including Walt Doyle) was given light duty at around the same time, or that any such employee was similarly situated to her in that he required the same type of light duty and was of similar seniority.  Absent such evidence, there is no basis for a jury to find that the circumstances could give rise to an inference of discrimination.  See Chan, 2006 WL 345853, at **5-6 (conclusory allegations as to similarity insufficient); Abato, 2007 WL 1659197, at *6 (same).  Therefore, Dauer has failed to establish a prima facie case with respect to this claim.

---

[10]  Dauer concedes that she received light duty assignments on several occasions, including for several months beginning in September 1995, and from April 2002 through December 2002.  (Rule 56.1 Stat. (MD) ¶ 18; Rule 56.1 Answer (MD) ¶ 18 (contesting only the allegation that Dauer received light duty from January through June 2003))

7.      **Denial of Pay for Time Off**

Dauer claimed in the Complaint and at her deposition that Verizon discriminated against her by failing to provide her with appropriate pay for time off in two instances.  (Cmplt. ¶ 18; Dauer Dep. at 205)  However, she failed to discuss this claim – or support it with admissible evidence – in her summary judgment opposition papers.  Accordingly, she has abandoned this claim and it need not be considered.  See, e.g., Spanierman v. Hughes, 576 F. Supp. 2d 292, 299 n.1 (D. Conn. 2008) (claims not discussed in summary judgment briefs are abandoned); Bronx Chrysler Plymouth, Inc. v. Chrysler Corp., 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002) (dismissing claim as abandoned because party opposing summary judgment "made no argument in support of th[e] claim at all" in its summary judgment opposition papers).

Even if the claim were considered on the merits, it would fail.  The first alleged denial of pay occurred in September 1996 (Dauer Dep. at 206:3-7), and therefore any claim based on this denial is time-barred under both state and federal law.  (See supra pp. 4-5)  The second alleged denial of pay occurred from June 2003 to the time her employment was terminated, when Dauer alleges that she was unable to work except for light duty, was told that no light duty work was available, and was not paid worker's compensation benefits.  (Dauer Dep. 213:6-9, 211:10-18)  Although this claim would be timely, it could not survive summary judgment because Dauer has not proffered any additional evidence concerning it.  For example, there is no evidence from which a jury could find that Dauer was entitled to worker's compensation benefits during this time period or that Verizon denied her those benefits, much less that Verizon denied Dauer such benefits because of her sex.

8.      **Unpled Claims**

In her summary judgment opposition papers, Dauer asserts several disparate treatment claims that she did not raise before the EEOC or plead in the Complaint.  These claims also fail as a matter of law. [11]

a.      **Termination From Employment**

In opposing summary judgment, Dauer argues that Verizon discriminated against her by terminating her employment instead of offering her long-term disability benefits.  (Pltf. Br. at 11)  Verizon argues that the Court should not consider this claim because Dauer did not raise it in her EEOC charge.  (Def. Br. at 17-18 & n.11)  Dauer responds that her failure should be excused because her employment was terminated on November 25, 2003 (Rule 56.1 Stat. (MD) ¶ 42), more than two years after she filed the charge.  (Pltf. Br. at 33)  However, there is no basis for excusing Dauer's failure to exhaust her administrative remedies.

A plaintiff may assert a claim that she failed to raise before the EEOC if it falls within one of three categories of claims that are "reasonably related" to those raised in her EEOC charge.  Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2002) (a district court may consider "Title VII claims only if they have been included in an EEOC charge 'or are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge'").  These three categories are:  (1) claims concerning

---

[11]  Because these claims fail for other reasons, this Court need not decide whether dismissal would be warranted solely because Dauer failed to plead them in the Complaint and did not seek leave to amend the Complaint to include the relevant allegations.  Under Fed. R. Civ. P. 15(b), the Court "may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000).  Defendant has not shown that Dauer's failure to plead these claims caused it any prejudice.

"conduct . . . [that] would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) claims "alleging retaliation by an employer against an employee for filing an EEOC charge"; and (3) claims "alleg[ing] further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."  Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003) (internal quotations omitted).

Dauer's claim that her termination from employment constitutes unlawful disparate treatment does not fall within any of these categories.  The first category is inapplicable because an event that occurred well after the EEOC investigation ended, as Dauer's termination did, could not reasonably be expected to fall within the scope of the investigation.  See Rule 56.1 Stat. (MD) ¶ 42 (stating that her employment was terminated on November 25, 2003); Cmplt. (stamped as filed on July 8, 2003); id. ¶¶ 9-10 (alleging that EEOC investigation ended before Complaint was filed).  The second category is applicable only to claims of retaliation stemming from the filing of an EEOC charge, and therefore would not apply to a disparate treatment claim based on Dauer's termination.[12]

The third category is inapplicable because the type of discriminatory act at issue – termination of employment – is not similar in nature to any of the types of discrimination that Dauer actually raised in the EEOC charge, such as being denied equipment and adequate bathroom facilities or being subjected to hostility and close supervision.  The most similar type of discrimination alleged in the EEOC charge is that

---

[12]  Dauer alternatively characterizes her termination claim as a retaliation claim (Pltf. Br. at 33), and it is discussed as such below (infra pp. 33-35).

Dauer was denied light duty (Ex. 47, p. 3 ¶ 9), but she does not argue that she should have been given light duty instead of being terminated.  She argues instead that she should have been allowed to remain employed until she qualified for long-term disability benefits (Pltf. Br. at 22).  This is not a claim of discrimination in "precisely the same manner" as the denial of light duty alleged in the EEOC charge.  Cf. Okon v. Appia, No. 06-Civ.-6810(CPS), 2008 WL 2245431, at **8, 10 (E.D.N.Y. May 29, 2008) (sexual harassment claim based on inappropriate touching was not reasonably related to sexual harassment claim raised in EEOC charge, which concerned allegedly inappropriate comments); Bresloff-Hernandez v. Horn, No. 05-Civ.-0384(JGK), 2007 WL 2789500, at *8 (S.D.N.Y. Sep. 25, 2007) (failure-to-accommodate claim based on denial of request for shift change was not one of discrimination "in precisely the same manner" as failure-to-accommodate claim based on failure to offer plaintiff a different position at earlier time).[13]

Therefore, Dauer's termination claim does not fall within any of the categories of claims that courts have recognized as being "reasonably related" to those raised in an EEOC charge, and the Court cannot excuse her failure to exhaust her administrative remedies.

### b.  Van Reassignments

Dauer also argues in her summary judgment opposition brief that she was treated differently in that "when a male field technician was out of work due to illness or injury, he received the same van, ladder and tools when he returned," whereas she "was

---

[13]  To the extent Dauer's termination claim is a re-characterization of her claims concerning denial of light duty and denial of pay for time off, it would fail for the same reasons that those claims fail.

given a different vehicle which had to be cleaned out and restocked from scratch." (Pltf. Br. at 4; Dauer Aff. ¶¶ 30, 31)  Dauer did not plead this claim in the Complaint or raise it before the EEOC.  The Court need not consider whether her failure to do so can be excused, however, because the claim would fail on the merits.  Dauer does not allege or proffer evidence that she suffered anything more than "inconvenience," Sanders, 361 F.3d at 755, due to having to clean out and restock a new van.  Therefore, she has failed to show that she suffered an adverse employment action.  Further, Dauer's conclusory statement that male field technicians received the same van, ladder and tools when they returned from sick leave is insufficient to give rise to an inference of discrimination, because Dauer does not give "concrete particulars," Bickerstaff, 196 F.3d at 451-52, concerning male employees who were treated more favorably or offer evidence showing that such male employees were similarly situated in all material respects.  See Chan, 2006 WL 345853, at **5-6 (conclusory allegations insufficient); Abato, 2007 WL 1659197, at *6 (same). [14]

*       *       *

        Dauer has failed to establish a prima facie case of disparate treatment because she has not proffered any evidence from which a jury could find that the complained-of conduct constituted an adverse employment action and occurred in

---

[14]  At her deposition, Dauer apparently asserted that she was also discriminated against in that she was not selected for two positions she applied for:  a Central Office technician position and a storekeeper position.  (See Def. Br. at 6, 17 n.10)  Dauer made no such claims in the Complaint; makes no such assertions in her memorandum of law opposing summary judgment; and provides no facts that could support such claims in her affidavit opposing summary judgment or in her responsive Rule 56.1 statement.  Accordingly, Dauer has abandoned this claim and the Court will not consider it.  See Spanierman, 576 F. Supp. 2d at 299 n.1; Bronx Chrysler Plymouth, 212 F. Supp. 2d at 249.

circumstances giving rise to an inference of discrimination.  Defendant is therefore entitled to summary judgment concerning Dauer's disparate treatment claims.

**B.**     <u>**Dauer's Retaliation Claims**</u>

In the Complaint, Dauer claims that Verizon unlawfully retaliated against her by "subject[ing] her to . . . hostility, micro management and unjust scrutiny" and denying her light duty.  (Cmplt. ¶¶ 24-26, 28)  Although she did not so plead in the Complaint, Dauer also argues that her transfer to the Installation & Repair department in July 2001 and subsequent termination were retaliatory.  (Pltf. Br. at 16, 33)  As with Dauer's disparate treatment claim, Verizon argues that Dauer's retaliation claims fail because she has not established a prima facie case of retaliation and, with respect to the termination claim, failed to exhaust her administrative remedies.  (Def. Br. at 18, 22-25)

In order to establish a prima facie case of retaliation, Dauer "must show that:  (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity."  <u>Schiano</u>, 445 F.3d at 608.  In the context of a retaliation claim, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Burlington N. & Santa Fe R.R. Co. v. White</u>, 548 U.S. 53, 68 (2006) (internal quotation omitted).  "[P]etty slights, minor annoyances, and simple lack of good manners" will not normally constitute adverse employment actions for purposes of a retaliation claim.  <u>Id.</u>

A plaintiff who suffers an adverse employment action can demonstrate a causal connection between the action and her protected activity by showing "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of

similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." McNair v. New York City Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001) (considering motion to dismiss) (citing DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)).

### 1.      **Dauer Engaged in Protected Activity**

Dauer argues that her protected activity consists of (1) making a variety of complaints to her managers and to Verizon through its internal EEO Hotline prior to filing her EEOC charge (Dauer Aff. ¶¶ 47, 49; Pltf. Br. at 16-17); and (2) filing the EEOC charge in late March 2001. For the purpose of deciding whether summary judgment is appropriate, the Court will assume that all of these complaints qualify as protected activity. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (complaining to EEOC is protected activity); Cifra, 252 F.3d at 208, 216 (complaining to company human resources department is protected activity).

### 2.      **Micromanagement, Managerial Scrutiny and Light Duty**

In her summary judgment opposition papers, Dauer does not argue that Verizon retaliated against her by micromanaging her, subjecting her to close scrutiny, and denying her light duty. Instead, Dauer cites only to evidence concerning co-worker hostility, her transfer, and her termination. (Pltf. Br. at 16-17, 33) The Court concludes that she has abandoned her other retaliation claims, and that it need not consider them. See, e.g., Spanierman, 576 F. Supp. 2d at 299 n.1; Bronx Chrysler Plymouth, 212 F. Supp. 2d at 249.

Even if Dauer had not abandoned these claims, however, they would not survive summary judgment. With respect to micromanagement and close supervision,

Dauer has not offered evidence that she experienced anything more than "petty slights" that, as a matter of law, do not constitute an adverse employment action in the context of a retaliation claim.  See White, 548 U.S. at 68; Dixon v. City of New York, No. 03-Civ.-343(DLI), 2008 WL 4453201, at *16 (E.D.N.Y. Sep. 30, 2008) ("[T]he law in this circuit . . . is clear that an employer's excessive scrutiny of an employee without more fails to satisfy the requirements for an adverse employment action [in the retaliation context].").  Therefore, Dauer cannot establish a prima facie case of retaliation with respect to that conduct.

Although the denial of light duty in December 2002 might arguably be an adverse employment action, Dauer nonetheless has not established a prima facie case with respect to that claim because she has not offered any evidence that a "causal connection exists between the" denial of light duty and any protected activity.  Schiano, 445 F.3d at 608.  She has not offered any direct proof of retaliatory animus with respect to this denial, nor has she offered sufficient evidence for a jury to find that a similarly situated male was treated differently.  See McNair, 160 F. Supp. 2d at 604; see also supra p. 23.  And the latest alleged protected activity – the filing of the EEOC charge in March 2001 – occurred nearly two years before the denial of light duty in December 2002, which is far too long a gap to imply a causal connection.  See, e.g., Gentile v. Potter, 509 F. Supp. 2d 221, 239 & n.9 (E.D.N.Y. 2007) (dismissing retaliation claim premised on act that occurred four months after protected activity where there was no direct evidence of retaliation); Nicastro v. Runyon, 60 F.Supp.2d 181, 185 (S.D.N.Y.1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and alleged act of retaliation.").

**3.**      <u>**Co-Worker Hostility**</u>

Dauer argues that her supervisors retaliated against her by engendering co-worker hostility.  (Pltf. Br. at 16-17)  She offers little evidence to support this claim, however.  First, Dauer asserts that a senior manager once asked her co-workers to "tone down" their language around her even though it did not bother her, which engendered "much hostility."  (Dauer Aff. ¶ 54)  Dauer also states that after she complained about pornography in the workplace, management made clear that pornography was prohibited because someone had objected to it; co-workers complained within her earshot "that they couldn't do what they have done for so many years because now they have women on the job."  (<u>Id.</u> ¶ 55; Dauer Dep. 257:12-258:4)

This evidence does not support Dauer's assertion that her managers attempted to engender hostility toward Dauer.  At most, it suggests that her co-workers expressed some resentment toward her.  Given that "Title VII 'does not set forth a general civility code for the American workplace,'" <u>White</u>, 548 U.S. at 68, no reasonable jury could find that the limited co-worker hostility Dauer alleges would have "dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Id.</u>; <u>see also</u> <u>Nugent v. St. Luke's/ Roosevelt Hosp. Ctr.</u>, No. 05-Civ.-5109(JCF), 2007 WL 1149979, at *9 (S.D.N.Y. Apr. 18, 2007) (holding, with respect to retaliation claim, that "mockery by other staff members is not an adverse action"); <u>Chan</u>, 2006 WL 345853, at

*9 (in retaliation context, allegations of "some hostility from co-workers . . . do not rise

to the level of an adverse employment action").[15]

### 4. <u>Retaliatory Transfer</u>

In opposing summary judgment, Dauer also asserts that her transfer to the

Installation & Repair Department was retaliatory.[16]  (Pltf. Br. at 16; Dauer Aff. ¶¶ 51-52)

Defendant argues that she has not made out a prima facie case with respect to this claim,

and that she cannot show that the articulated reason for her transfer is false.[17]  (Def. Br. at

24-25)  Defendant is entitled to summary judgment on this claim because Dauer has not

offered evidence from which a jury could find that her transfer was an adverse

employment action or that it was motivated by retaliatory intent.

---

[15]  Moreover, Dauer does not cite evidence showing when the alleged co-worker hostility occurred, and there is therefore no factual basis for a jury to infer a causal connection between the hostility and any protected activity.

[16]  Dauer did not plead this claim in the Complaint, despite the fact that her transfer occurred approximately two years before the Complaint was filed.  Dauer also did not raise it in the EEOC charge (which was filed approximately three months before the transfer).  However, Verizon does not argue that this claim is not "reasonably related" to the claims raised in the EEOC charge.

[17]  Verizon's stated reason for the transfer is that it needed more employees in the Installation & Repair department and fewer employees in the Construction department, where Dauer had previously worked. (Def. Br. at 24-25)  Dauer does not challenge Verizon's contention that there was a business need for more employees in the Installation & Repair department, but she does assert that a less-senior employee should have been transferred in her place.  (Dauer Dep. 144:3-14, 147:13-16, 147:17-21) However, Dauer concedes that the five other employees who were transferred with her were male, including one who had three weeks more seniority than she did.  (<u>Id.</u> 148:12-14, 149:2-21)  Dauer also concedes that the less-senior employees who were not transferred were in the "line" group, whereas she and the others who were transferred were in the "construction" group, and that while employees in both groups had the same job titles and were "supposed to be able to do" either job, in practice they primarily performed one type of work or the other.  (<u>Id.</u> 159:14-161:5)

With respect to showing that the transfer was an adverse employment action, Dauer has identified only two negative aspects of the new job at the Installation and Repair Department:  (1) it involved more customer contact, and (2) it was more challenging physically because she lost her permanent bucket truck assignment.  (Dauer Dep. 143-46)

Dauer's dissatisfaction with having increased customer contact is akin to a "minor annoyance" that, as a matter of law, is not an adverse employment action.  White, 548 U.S. at 68; see also Alers v. New York City Human Res. Admin., No. 06-Civ.-6131(SLT)(LB), 2008 WL 4415246, at *7 (E.D.N.Y. Sep. 24, 2008) (in ADA retaliation case, plaintiff's "dissatisfaction with her duties," without more (such as a diminution in pay or a loss of prestige), was not a sufficient basis to find that an employment action was materially adverse); Garber v. New York City Police Dep't, No. 95-Civ.-2516(JFK), 1997 WL 525396, at *7 (S.D.N.Y. Aug. 22, 1997) (holding that the "[p]laintiff's dissatisfaction with the transfer, standing alone, does not support his claim of an adverse employment action" in the retaliation context).

Dauer also has not offered sufficient evidence to show that the second negative consequence – reduced access to bucket trucks – constituted an adverse employment action.  As explained above, Dauer has not offered the requisite "concrete particulars" that would permit a jury to find that her reduced access to bucket trucks represented a material disadvantage in her working conditions.  (See supra pp. 14-16) Although the standard for showing an adverse employment action is arguably lower in the retaliation context, see Early v. Wyeth Pharm., Inc., No. 07 Civ 0947(WCC), 2009 WL 497362, at *15 (S.D.N.Y. Feb. 25, 2009), a plaintiff must still demonstrate that the

34

employment action was "materially adverse."  White, 548 U.S. at 68 ("We speak of

*material* adversity because we believe it is important to separate significant from trivial

harms." (emphasis in original)).

       Moreover, Dauer has not offered any evidence showing that the manager

or managers who decided to transfer her had any understanding that she would find her

new position less desirable or that she would lose her permanent bucket truck assignment

at the new garage.[18]  Therefore, there is no rational basis for a jury to infer that Dauer's

transfer was motivated by retaliatory intent.  Cf. Menes v. City Univ. of New York

Hunter Coll., 578 F. Supp. 2d 598, 615 (S.D.N.Y. 2008) (in First Amendment retaliation

case, holding that even if plaintiff's transfer could be considered an adverse employment

action, there was no "causal connection" between that action and plaintiff's protected

activity because "there [wa]s no evidence that" the individuals who transferred plaintiff

"knew" or "could have foreseen" the alleged negative consequences of the transfer).

    **5.**    **Termination From Employment**

       Dauer's unpled retaliatory termination claim fails because she has not

exhausted her administrative remedies with respect to that claim, and the claim is not

"reasonably related" to those raised in her EEOC charge.  This claim does not fall within

the first or third categories of "reasonably related" claims for the same reason her

disparate treatment termination claim does not.  (See supra pp. 25-27)  While Dauer's

retaliatory termination claim potentially falls within the second category – claims of

"retaliation by an employer against an employee for filing an EEOC charge," Terry, 336

---

[18] Indeed, Dauer does not know who made the decision to transfer her.  (Dauer Dep. 143,
145)

F.3d at 151 – this category applies only where the plaintiff alleges in her complaint a "specific linkage between filing [her] EEOC charge and . . . [the] act of retaliation." Alfano, 294 F.3d at 382; see also Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1402 (2d Cir. 1993) (explaining that in such cases the Second Circuit has "relaxed the exhaustion requirement based on the close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself"), superceded by statute on other grounds as recognized in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).

Dauer has not alleged that there is any link between her termination in November 2003 and the EEOC charge she filed in March 2001, nearly three years earlier, nor has she offered any evidence from which a link could be inferred.[19]  Dauer has not offered direct proof of retaliatory intent or evidence that similarly situated individuals were treated differently (see supra p. 31), and her termination is too remote in time from the filing of the charge to infer any connection between the two.  Gentile, 509 F. Supp. 2d at 239 & n.9 (four months is too long to give rise to an inference of a causal connection); Nicastro, 60 F.Supp.2d at 185 (three months is too long).  Dauer's failure to allege or offer specific evidence of a link between her filing of an EEOC charge and her termination precludes the Court from excusing her failure to exhaust her administrative remedies.[20]

---

[19]  Dauer's employment was terminated after she filed the Complaint, but Dauer never sought to amend the Complaint to include allegations concerning her termination.

[20]  Even if the Court were to reach the merits of a claim that Dauer was terminated in late November 2003 in retaliation for filing the July 2003 Complaint (Pltf. Br. at 33), it would find that she has not established a prima facie case because there is no evidence of a causal connection between the two events.

\*       \*       \*

For the reasons stated above, Verizon is entitled to summary judgment on Dauer's retaliation claims.[21]

## C.       Dauer's Hostile Work Environment Claim

Relying on the same evidence, Dauer also presents a hostile work environment claim.  (Pltf. Br. at 26-31)  Defendant argues that the conduct at issue cannot support a hostile work environment claim because Dauer describes nothing more than the "ordinary tribulations of the workplace."  (Def. Br. at 20)  Defendant further argues that Dauer has not offered the requisite evidence from which a jury could find that the conduct "was caused by animus toward her gender."  (Def. Br. at 21)

### 1.       Applicable Standards

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct:  (1) 'is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'"  Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (internal citations omitted); see also Schiano, 445 F.3d at 604 (to prevail on a hostile

---

[21] At her deposition, Dauer apparently testified that she was retaliated against when confidential matters were revealed to her co-workers.  (Def. Br. at 22 (citing Dauer Dep. at 250))  However, as with a number of Dauer's other claims, she did not plead this claim in the Complaint, makes no such assertion in her memorandum of law opposing summary judgment, and provides no facts that could support such a claim in her affidavit opposing summary judgment or in her responsive Rule 56.1 statement.  The Court concludes that Dauer has abandoned this claim and will not consider it.  See, e.g., Spanierman, 576 F. Supp. 2d at 299 n.1; Bronx Chrysler Plymouth, 212 F. Supp. 2d at 249.

work environment claim, a plaintiff must show "that the work environment both objectively was, and subjectively was perceived by the plaintiff to be, sufficiently hostile to alter the conditions of employment for the worse"). [22]

The first element of a hostile work environment claim is established where "the workplace atmosphere, considered as a whole, undermined plaintiffs' ability to perform their jobs, compromising their status as equals to men in the workplace." Dawson v. County of Westchester, 373 F.3d 265, 274 (2d Cir. 2004). "[S]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Petrosino, 385 F.3d at 223. "Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000); see also Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) ("[t]he incidents [alleged to have created a hostile work environment] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive").

**2.    Dauer Has Not Offered Sufficient Evidence that the Complained of Conduct Occurred Because of Her Sex**

As discussed above with respect to Dauer's disparate treatment claims, Dauer has not offered anything more than conclusory evidence that the complained-of

_____

[22] A plaintiff asserting a hostile work environment claim must also "show that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). Defendant does not argue that Dauer would be unable to succeed on this element of her hostile work environment claim.

conduct occurred because of her sex.  (See supra pp. 17-18, 22-24, 28)[23]  This alone is a

sufficient reason to grant Defendant summary judgment on Dauer's hostile work

environment claim.  See Patane, 508 F.3d at 113 (plaintiff must show "that the

complained of conduct . . . 'creates . . . [a hostile or abusive] environment because of . . .

[her] sex'"); Brown, 257 F.3d at 252 ("It is axiomatic that mistreatment at work, whether

through subjection to a hostile work environment or through such concrete deprivations

as being fired or being denied a promotion, is actionable under Title VII only when it

occurs because of an employee's sex, or other protected characteristic.").

### 3.    Dauer Has Not Offered Evidence that the Complained of Conduct Was Sufficiently Severe or Pervasive

Dauer's hostile work environment claim also fails because she has not

offered evidence from which a jury could find "that the complained of conduct . . . is

objectively severe or pervasive."  Patane, 508 F.3d at 113 (internal quotation omitted).  In

making this determination, the Court has considered – as it must – the totality of the

evidence offered by Dauer in support of her disparate treatment and retaliation claims.

See Petrosino, 385 F.3d at 221 (courts must consider "totality of the circumstances").  It

has also considered the other factors identified by the Second Circuit, including "the

frequency of the discriminatory conduct; its severity; whether it [wa]s physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

_____

[23]  Dauer offers one concrete example of being denied a bucket truck and then witnessing a bucket truck being provided to a male employee.  (See Dauer Dep. 203:4-9)  However, Dauer offers no evidence from which a jury could find that the male employee was similarly situated – i.e., that she and he had the same or a similar need for a bucket truck on that particular day.  Therefore, this example is insufficient to give rise to an inference of sex-based discrimination.

interfere[d] with . . . [Dauer's] work performance." Schiano, 445 F.3d at 605 (internal quotation omitted).

With respect to the first factor, Dauer has not offered evidence that most of the complained of conduct occurred frequently. The one exception is that she has offered conclusory testimony that she "frequently" requested the use of a bucket truck after July 2001 and her request was granted only 50% of the time. (Dauer Aff. ¶¶ 23-24)

With respect to the second and third factors, Dauer has offered virtually no evidence that the complained of conduct was severe, threatening or humiliating. The only concrete evidence that goes to this issue is Dauer's deposition testimony that she was "rather embarrassed" on the few occasions when she inadvertently entered a bathroom when a male co-worker was in one of the stalls. (Dauer Dep. 177:7-13, 189:4-20)

With respect to the fourth factor, Dauer has not offered evidence that the complained of conduct unreasonably interfered with her work performance. Indeed, she has not offered evidence showing that it interfered with her work performance at all. For example, as discussed above, Dauer has not offered evidence showing that Defendant actually failed to provide her with a bucket truck or with assistance on an occasion when either was necessary to perform her job. (See supra pp. 15, 17-18)

Thus, Dauer has offered virtually no concrete evidence from which a jury could find that the complained of conduct was "objectively severe or pervasive" such that it "create[d] an environment that a reasonable person would find hostile or abusive." Patane, 508 F.3d at 113. In contrast, in the cases Dauer cites, the plaintiffs offered specific evidence of significantly more severe conduct. In Raniola v. Bratton, 243 F.3d

610 (2d Cir. 2001), for example, the plaintiff police officer presented evidence that

during a two-year period:  (1) she was subjected to highly offensive remarks, including

her supervisor's reference to women as "bitches" and a poster stating that she and her

female partner would provide "free blow jobs" and were "cunts"; (2) her supervisor

denied her requests to work certain shifts while granting similar requests from male

employees; (3) her supervisor gave her and her female partner higher quotas for issuing

tickets for traffic violations, responsibility for responding to issues arising in the largest

and least desirable section of the precinct, and several other undesirable assignments

(such as performing safety inspections of taxi and bus drivers); (4) her supervisor told

male officers who requested a commendation that would include the plaintiff and her

female partner to re-write the request without including the women; (5) her supervisor

stated at roll call that if the plaintiff "opens her mouth, I am going to put one in her

fucking head"; and (6) on at least five occasions, the plaintiff suffered "workplace

sabotage," such as having her paperwork thrown in the trash.  Id. at 618-620.

       Similarly, in Dawson v. County of Westchester, 373 F.3d 265 (2d Cir.

2004), the plaintiffs offered evidence that they asked their male supervisor to investigate

two letters, allegedly written by inmates, that "contained degrading, explicit, and violent

sexual references to individual female COs, including the plaintiffs," and "featured an

obscene drawing."  Id. at 268.  The supervisor failed to investigate or report this

correspondence to his superiors, and instead circulated the letters among plaintiffs'

colleagues.  Id. at 268-69.  The supervisor later made inappropriate remarks to the

plaintiffs, such as asking one "what other body parts [did she] have pierced."  The

plaintiffs also testified that after the letters were disseminated they "were subjected to a

barrage of inappropriate stares, whispers, laughter, and remarks from their colleagues."
Id. at 269.

The Second Circuit explained in Dawson that the "crucial" question is
"whether the workplace atmosphere, considered as a whole, undermined plaintiffs' ability
to perform their jobs, compromising their status as equals to men in the workplace."  Id.
at 274.  Unlike in Dawson, there is no factual basis for a jury to conclude here that
Defendant's conduct materially undermined Dauer's ability to perform her job.

*     *     *

Because Dauer has not offered evidence that would enable a reasonable
jury to find in her favor on the first and third elements of her hostile work environment
claim, Defendant is entitled to summary judgment on that claim.[24]

---

[24]  In deciding this claim, the Court has considered the evidence concerning negative
conduct directed at Dauer.  The Court rejects Plaintiffs' implicit argument that their
evidence of harassment should be considered jointly with respect to each of their claims –
i.e., that Pucino's evidence of the harassment she experienced should be considered in
support of Dauer's claim.  (Pltf. Br. at 26-31 (failing to address each plaintiff's hostile
work environment claim separately))  While the Second Circuit has held that "a plaintiff
who herself experiences discriminatory harassment need not be the target of other
instances of hostility in order for those incidents to support her claim," Cruz, 202 F.3d at
570, Plaintiffs have offered no basis for extending this principle to permit a plaintiff to
pursue a hostile work environment claim even though she cannot show that the instances
of alleged harassment that she experienced were sufficiently severe or pervasive to create
a hostile work environment.

In Cruz, the Court merely permitted the plaintiff to offer evidence that the same alleged
harasser also made racially derogatory remarks to other minority employees.  Id. at 570-
71.  Here, in contrast, Plaintiffs have not offered evidence that the same supervisors
subjected them to the same types of negative treatment.  Because Dauer has not offered
evidence showing that she was subjected to a hostile work environment – much less the
same hostile work environment that Pucino alleges she was subjected to – there is no
reason to allow Dauer to assert a claim based on Pucino's evidence.  See Liebovitz v.
New York City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001) (plaintiff's hostile work
environment claim failed where the evidence showed that she "was not herself a target of

**<u>SUMMARY JUDGMENT MOTION CONCERNING PUCINO</u>**

Pucino began employment with Defendant (or its predecessor) in 1982. (Pucino Aff. ¶ 2)  She worked as a cable splicer or field technician from 1991 through December 7, 2002, and was assigned to Defendant's Union Avenue garage from 1995 through 2002.  (<u>Id.</u> ¶¶ 2-3, 20, 25; Pucino Dep. 13:3-22)

Like Dauer, Pucino claims that Defendant discriminated against her on the basis of her sex in the following ways:

> (1)   assigning older bucket trucks to her, while assigning "better" trucks to less-senior male employees (Cmplt. ¶ 14; Pltf. Br. at 4-5);
>
> (2)   assigning her to perform "two-man" jobs alone and encouraging her co-workers not to assist her (Cmplt. ¶¶ 15-17; Pltf. Br. at 6-7);
>
> (3)   failing to provide a women-only bathroom and reprimanding her for using offsite bathrooms (Cmplt. ¶ 20; Pltf. Br. at 15);
>
> (4)   criticizing her work and micro-managing her (Cmplt. ¶ 16; Pltf. Br. at 8-10); and
>
> (5)   denying her light duty work (Cmplt. ¶ 19; Pltf. Br. at 12; <u>see also</u> Def. Br. at 2).

In the Complaint, Pucino also makes (1) a retaliatory discharge claim based on the argument that she was forced to retire because she was denied light duty (Cmplt. ¶¶ 25-27; Pltf. Br. at 33); (2) retaliation claims based on allegations of co-worker hostility (Cmplt. ¶¶ 24-25; Pltf. Br. at 17-18); and (3) a hostile work environment claim (Cmplt. ¶ 13; Pltf. Br. at 26-31).[25]

------

the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing").

[25]  Like Dauer, Pucino raised a number of claims at her deposition and in her brief opposing summary judgment that she neither raised before the EEOC nor pled in the Complaint.  These claims are likewise discussed below.  (See <u>infra</u> pp. 50-55)

**A.**     **Pucino's Disparate Treatment Claims**

As with Dauer, Defendant's sole argument with respect to Pucino's disparate treatment claims is that she has not established a prima facie case of discrimination.  (Def. Br. at 6)  The Court finds that Defendant is entitled to summary judgment on these claims.

**1.**     **The Bucket Truck Claim**

Like Dauer, Pucino claims that she was discriminated against in that she was sometimes denied the use of a bucket truck.  However, unlike Dauer, Pucino has not offered evidence that she was denied a permanent bucket truck assignment during the time period for which she can bring a claim.[26]  Based on the evidence she has offered, it appears that her actual complaint is that she was assigned inferior bucket trucks.  (Pltf. Br. at 4-5)[27]  Even more so than in Dauer's case, Pucino's evidence with respect to bucket trucks shows, at most, that she was not provided with the most desirable equipment.  She has not proffered evidence from which a jury could find that she was

---

[26]  Pucino testified that she could recall being denied a permanent truck assignment after 1995, but could not recall specific dates.  (Pucino Dep. 22:18-24)  She could not recall whether she was ever skipped over for a bucket truck assignment after 1998.  (Id. 22:18-23:7 (saying that she did not "know for sure"))

[27]  Pucino states in her affidavit that:  (1) during an unspecified time period, she was "frequently denied assignment to a bucket truck even though . . . [she] had the requisite seniority" (Pucino Aff. ¶ 18); (2) at unspecified times, she was "skipped over in favor of" less senior male employees, including Ted Saltershack, Paul Martinex and Bob Wilkens (id. ¶ 19); (3) in or about 1992, Pucino was "passed over for assignment to a newer bucket truck" in favor of a less senior male (id. ¶ 20); (4) after complaining to her union shop steward about the 1992 incident, she was given an old bucket truck that became inoperable shortly thereafter (id.); (5) she was passed over in favor of less senior male employees on other occasions until 1995, when she was assigned a permanent bucket truck (id.); and (6) her bucket truck "was taken away" later in 1995 when she was transferred to the Union Avenue garage and reassigned an older truck (id.; Pltf. Br. at 5).

44

denied equipment that was necessary to perform her job (or to perform it safely).

Therefore, Pucino has not established that she suffered an adverse employment action

with respect to bucket trucks, and has not made out a prima facie case on this claim.  (See

also supra pp. 12-16)

    **2.**    **Failure To Provide Assistance**

        Pucino also claims that her supervisors discriminated against her by failing

to provide assistance.  While she has presented more evidence than Dauer in support of

this claim, her evidence still falls short of establishing a prima facie case of disparate

treatment.

    **a.**    **Pucino's Evidence**

        Pucino asserts that her supervisors required her to "perform tasks alone

that the male employees handled in pairs" (Pucino Aff. ¶ 25) and that such assignments

were "constant."  (Pucino Dep. 44:6-17; see also Pucino Aff. ¶ 25 (stating that she

"often" received such assignments "from 1995 to 2002"); Pucino Dep. 44:6-12 (testifying

that while she could not give a time frame, there were "many, many times" when she was

assigned to work alone); id. 45:4-18 (testifying that this happened "daily" when she was

working primarily in downtown Newburgh)).

        A co-worker testified that he "observed [supervisors] Hinspeter and

Moore harassing Pucino when she asked for assistance on jobs that were routinely 'two-

man' jobs."  (Burton Aff. ¶ 5)  Moreover, in 1997 or 1998 Hinspeter told this co-worker

"to stay away from Pucino" because "she was 'trouble.'"  Hinspeter questioned the co-

worker "closely" "whenever [he] had occasion to give or receive assistance on the job

from Pucino."  (Id. ¶¶ 10-11)

In addition, Pucino was told to call a supervisor if she needed help. (Pucino Aff. ¶¶ 26-30)  Male employees, on the other hand, were allowed to request assistance by calling dispatch rather than their supervisors.  (Pucino Dep. 56:24-57:4) When Pucino did call supervisors Hinspeter and Moore seeking assistance, one or both would come to the location to watch or "look at the job and laugh and go away." "Sometimes they would not come at all."  (Id. 45:25-46:19, 55:3-4)  Occasionally, Hinspeter and Moore assisted Pucino by " stop[ping] the traffic if there was a lot of traffic."  (Id. 54:8-22)

On occasions when Pucino requested assistance at the outset of an assignment, she was told that none was available, but "several times when this happened, a male requested and received help in her presence."  (Pucino Dep. 62:13-63:5; see also id. 63:6-24 (repeating that "several times" Hinspeter agreed to give a male employee assistance in Pucino's presence immediately after denying it to Pucino))  She "never saw" supervisors Hinspeter or Moore deny a male co-worker's request for assistance. (Id. 59:22-25)  When she complained to Hinspeter about this, he "told her to get lost" and "to go kill herself."  (Id. 63:14-64:6)

Pucino has conceded that there were times that she received assistance (Pucino Dep. 57:5-19), even when she requested it of Hinspeter and Moore (id. 59:4-16), although it was "[l]ess than half the time" (id. 58:5-15).  Pucino has also acknowledged that "there were some men that did things themselves."  (Id. 59:17-21)  Pucino has stated that when Julie Mulherin supervised her, Mulherin did not deny her assistance.  (Id. 61:9-13)  (See also Rule 56.1 Stat. (JP) ¶¶ 41-44)

b.        **Pucino Has Not Established a Prime Facie Case**

Although Pucino has offered more evidence than Dauer on this claim, she

has not offered sufficient evidence for a jury to find that she was subjected to an adverse

employment action.  Unlike Dauer, Pucino has offered some evidence that she was

actually denied assistance on occasion when she requested it.  However, she has not

offered a concrete basis for a jury to find that she was denied assistance on occasions

when such assistance was necessary to perform her job, nor does she even explain the

nature of the assistance she sought or why it was necessary or preferable.  As Pucino

acknowledged, even the supervisors who allegedly treated her the worst sometimes

provided assistance (Pucino Dep. 54:8-22, 57:5-19), and certain male field technicians

commonly worked without assistance (id. 59:17-21).  In light of these concessions, and in

the absence of evidence providing concrete particulars about the occasions on which she

was denied assistance – in particular, proof that she was denied assistance in a situation

which required it – no jury could reasonably infer that the denial of assistance

significantly interfered with Pucino's ability to perform her job or otherwise created the

"materially significant disadvantage" necessary to find that she suffered an adverse

employment action.  Beyer, 524 F.3d at 164.

Moreover, Pucino has offered only conclusory evidence that similarly

situated male employees were treated differently.  Therefore, she has not established

either that she suffered an adverse employment action or that the circumstances could

give rise to an inference of discrimination.  Accordingly, she has not made out a prima

facie case with respect to this claim.  See Bickerstaff, 196 F.3d at 456 (plaintiff must

provide "concrete particulars" to survive summary judgment); Chan, 2006 WL 345853,

47

at *5 (conclusory assertions that similarly situated employees were treated more favorably are not enough to defeat summary judgment).

      3.      **<u>Bathrooms</u>**

            To the extent Pucino asserts a disparate treatment claim based solely on Defendant's failure to provide women-only bathrooms, she relies largely on the same evidence as Dauer concerning the availability and condition of the bathrooms at Defendant's offices.  (Pltf. Br. at 14-15)  In addition, Pucino has offered evidence that two supervisors, Hinspeter and Moore, prohibited her from stopping at public restrooms while she was in the field, although male employees "were . . . known to relieve themselves while out in the field" and "no company rule prohibited field technicians from using public restrooms as necessary."  (Pucino Aff. ¶¶ 6-8)  Pucino has also testified that Hinspeter and Moore "reprimanded" her "several times" for using public restrooms.  (<u>Id.</u> ¶ 8; Pucino Dep. 92:8-16)

            Although Pucino has offered some evidence that she was treated worse than Dauer with respect to using off-site bathrooms, this additional evidence does not warrant a different result.  Pucino has not offered evidence from which a jury could find that she suffered anything more than inconvenience or annoyance.  Therefore, she has not established that she suffered an adverse employment action.  The fact that Pucino was reprimanded does not change the result, because "reprimands . . .  do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation," and Pucino offers no such evidence.  <u>Uddin</u>, 427 F. Supp. 2d at 429.

####     4.     **Criticism and Micro-Management**

Like Dauer, Pucino claims that her supervisors "singled [her] out . . . for public criticism and humiliation" (Pucino Aff. ¶ 31-34); followed her to work sites (id. ¶¶ 37, 42-45, 47-48); and attempted to engender hostility against her, for instance by prohibiting her co-workers from stopping for cold drinks between jobs and blaming Pucino for the new rule.  (Id. ¶¶ 38-40)

Because Pucino offers no evidence that she suffered concrete "negative results" from the alleged criticism or close supervision, she has not established that she suffered an adverse employment action.  Uddin, 427 F. Supp. 2d at 429.  (See also supra pp. 21-22)[28]

####     5.     **Denial of Light Duty Work**

Finally, Pucino asserts a disparate treatment claim premised on her having been denied light duty work.  In her affidavit opposing summary judgment, Pucino identifies two time periods when she was not given light duty.  (Pucino Aff. ¶¶ 59-63, 72-75)  She does not offer sufficient evidence of disparate treatment to survive summary judgment, however.

The first time period was "in or about 1998."  Pucino complained to her supervisor that a male employee in a different work group had been given light duty, when Pucino had been told that no light duty was available.  (Pucino Aff. ¶¶ 59-63)

---

[28]  Pucino also offers evidence that a supervisor at the Pierce's Road garage "repeatedly assigned Pucino jobs for which she lacked the training or skills to perform" and then "singled her out in front of male co-workers for incompetence."  (Pltf. Br. at 8-9; Pucino Aff. ¶¶ 32-33)  Pucino worked in the Pierce's Road garage prior to 1995, however. Accordingly, a disparate treatment claim based on this conduct would be untimely under both state and federal law.  (See supra p. 5)

Pucino states that after she complained, the male employee was removed from light duty and sent home.  (Pucino Aff. ¶ 62)  Any federal disparate treatment claim based on this incident would be time-barred.  (See supra p. 5)  Even if such a claim were not time-barred, it would fail on the merits, because Pucino's only evidence about the treatment of similarly situated employees is her conclusory testimony that a male employee was removed from light duty at the same time she was told that there was no light duty.  Even if her evidence provided a sufficient basis for a jury to conclude that she and the male employee were "similarly situated in all material respects," Mandell, 316 F.3d at 379, which it does not, a jury still could not infer discriminatory intent, because Pucino's evidence shows that she and the male employee were both ultimately denied light duty.

Pucino also appears to claim that she should have been given light duty at times during the period between December 2001 and December 2002, and possibly after December 2002.  (Pucino Aff. ¶¶ 72-75)  However, she offers no evidence whatsoever as to whether light duty work was available at these times or whether similarly situated male employees were provided with light duty work during those periods.  Nor does she offer any other evidence from which a jury could infer that she was denied light duty due to the decision makers' discriminatory intent.[29]  In the absence of such evidence, no reasonable jury could find that Pucino was denied light duty in circumstances giving rise to an inference of discrimination.

_____

[29]  In fact, it appears that Pucino's supervisor at the time she requested light duty was Julie Mulherin.  (Mulherin Dep. 29:16-30:4)  Pucino has not identified Mulherin as a supervisor who discriminated against her on the basis of her gender.  (Pucino Dep. 96:18-97:5)  Moreover, Defendant has offered undisputed evidence that no employees under Pucino's third-level supervisor were given a light duty assignment at the time in question. (Mulherin Dep. 29:16-30:4)

6.     **Unpled Claims**

Like Dauer, Pucino raises allegations of disparate treatment in her
summary judgment opposition papers that were not pled in the Complaint.  Pucino argues
that her supervisors also discriminated against her by:  (1) refusing to provide her with
certain tools while providing those tools to male colleagues; (2) changing her assigned
work area simply to harass her; and (3) denying her overtime opportunities.  (Pltf. Br. at
5, 11)  Pucino did not make any allegations concerning this conduct in her EEOC charge.
(Def. Ex. 14)  Therefore, the Court may not consider disparate treatment claims based on
this conduct unless they fall within one of the three categories of claims that are
reasonably related to those in the EEOC charge.  (See supra pp. 25-26)  However, Pucino
has not even attempted to show that stand-alone disparate treatment claims based on this
conduct would be "reasonably related" to her EEOC charge, and the Court discerns no
basis for finding in her favor on this issue.

The only potentially applicable category of "reasonably related" claims is
that of claims concerning "conduct . . . [that] would fall within the scope of the EEOC
investigation which can reasonably be expected to grow out of the charge of
discrimination."  Terry, 336 F.3d at 151; see also supra pp. 25-28 (explaining
inapplicability of second and third categories with respect to similar claims raised by
Dauer).  In this regard, "[j]udicial claims which serve to amplify, clarify, or more clearly
focus earlier EEO complaints are appropriate," but "[a]llegations of new acts of
discrimination, offered as the essential basis for the requested judicial review are not
appropriate."  McGuire v. U.S. Postal Serv., 749 F. Supp. 1275, 1287 (S.D.N.Y. 1990)
(internal citation omitted).  Therefore, while it may be appropriate for the Court to

51

consider the new complained of conduct as additional evidence in support of Pucino's

hostile work environment claim, the Court finds no reason to excuse Pucino's failure to

exhaust her administrative remedies with respect to disparate treatment claims based on

such conduct.[30]

Moreover, Pucino has made no effort to establish a prima facie case of

disparate treatment with respect to the alleged conduct.  (See Pltf. Br. 19-26)  Nor does it

appear that she could do so based on the evidence in the record.

### a.      Overtime

Pucino's evidence with respect to denial of overtime is limited to the

following affidavit testimony:  "While I was employed at the Union Avenue Garage,

overtime was assigned on an equal basis to all field technicians.  However, when

Hinspeter was in charge of assigning overtime, he skipped over me even though I was

next on the list.  This occurred at least ten times."  (Pucino Aff. ¶¶ 56-58)  This testimony

is insufficient for a jury to find that Hinspeter "skipped over" Pucino in assigning

overtime because of her sex.  Pucino does not offer evidence, for example, that Hinspeter

"skipped over" her in order to reach a male employee.  Nor does Pucino offer evidence

that Hinspeter never "skipped over" a male employee to reach another male employee or

a female employee.  In sum, Pucino has offered no direct evidence of discriminatory

_____

[30] The Second Circuit has explained that the exception at issue here – for claims relating
to "conduct . . . [that] would fall within the scope of the EEOC investigation which can
reasonably be expected to grow out of the charge of discrimination" – "is essentially an
allowance of loose pleading and is based on the recognition that EEOC charges
frequently are filled out by employees without the benefit of counsel . . . ."  Deravin v.
Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (internal quotations omitted).  In this case,
Pucino was represented by counsel when she submitted her EEOC charge.  (Def. Ex. 14 ¶
20)

animus (see also infra pp. 63-65), and has not offered any evidence that similarly situated men were treated differently.  Indeed, there is no evidence in the record concerning how Hinspeter treated other employees in assigning overtime.  Therefore, Verizon would be entitled to summary judgment on this claim.

      **b.**        **<u>Location of Work Assignments</u>**

      Pucino's evidence concerning her work assignments is similarly sparse. She offers the following affidavit testimony:  "During the several periods when Hinspeter was my supervisor, he routinely changed my work area for no apparent reason other than to harass me.  When I asked Hinspeter why he was changing my work area, he would give no response and tell me to go away.  Hinspeter did not treat similarly situated co-workers in this way."  (Pucino Aff. ¶¶ 53-55)  Pucino has not offered any factual basis for a jury to find that a change in her work area caused her anything more than an "inconvenience," <u>Sanders</u>, 361 F.3d at 755, and there is therefore no basis for a jury to find that this conduct was an adverse employment action.  Further, her conclusory assertion that Hinspeter "did not treat similarly situated co-workers in this way" is insufficient to give rise to an inference that the conduct was motivated by discriminatory intent.  <u>Chan</u>, 2006 WL 345853, at **5-6 (conclusory allegations as to similarity insufficient); <u>Abato</u>, 2007 WL 1659197, at *6 (same).  Therefore, Verizon would also be entitled to summary judgment on this claim.

      **c.**        **<u>Denial of Tools</u>**

      With respect to a denial of tools, Pucino's evidence – supplied in both affidavit and deposition form – is internally contradictory and insufficiently detailed to permit a jury to find in her favor on a disparate treatment claim.

In her affidavit, Pucino states that "[w]hile working at the Union Avenue Garage, <u>on several occasions</u>, when I asked either supervisor Hinspeter or Moore for a tool, he either said there were none or told me to go away."  Pucino then states that "[<u>o]n many occasions</u>, I watched Hinspeter give a tool to a male co-worker that he had just denied to me," and identifies Andy Embler as one of those male co-workers.  (Pucino Aff. ¶¶ 22-23 (emphasis added))  Pucino further comments that "[w]ithout the right tools, the job was harder or even impossible to perform."  (Pucino Aff. ¶ 24)  Pucino does not, however, explain when she was denied a tool, what tools she and the male co-worker requested, or why she or the male co-worker needed the tool in question.  She likewise does not identify any job that she was not able to complete because of the denial, or even a job that was more difficult to complete without a particular tool.

At her deposition, Pucino testified that there "were <u>several times</u> when . . . [she] either didn't have a tool, lost a tool or needed a tool and . . . would ask for it, or the tool would not be on the truck that . . . [she]was given.  [The foreman] . . . would say sorry, we don't have any or Justin [Hinspeter] . . . would say go away."  (Pucino Dep. 108:15-109:4 (emphasis added))  Pucino testified that she was denied "[a]nything from hand tools to major tools."  (<u>Id.</u> 107:8-15)

When asked why she believed that the supervisors actually had the tool she requested on these "several" occasions, Pucino cited "one particular occasion" when she "watched [Andy Embler] come up behind me and ask for the same tool and was given it" by Hinspeter.  (Pucino Dep. 109:8-11, 111:3-6)  Pucino testified that the tool in question was a "B tool," which is used to "open . . . cross boxes or access points."  (<u>Id.</u> 109:22-10)  Pucino further testified that "[i]t would be almost impossible to do your job

54

without a B tool," but that on the particular day in question, she was able, "[w]ith a struggle," to perform the job using needle nose pliers.  (Id. 110:13-111:2)

Considering this evidence in the light most favorable to Pucino, it indicates that on several occasions during her seven years at the Union Avenue Garage, Hinspeter or Moore denied her a tool that she requested.  With the exception of one incident, Pucino does not state – except in the most general sense – the nature of the tool she sought, whether or why the tool was necessary for her to perform her duties that day, the identity of the male employee who requested the same tool, and the nature of the duties assigned to the male employee that day and whether or why the tool was necessary for the male employee to perform his duties.  As to the one incident she does present details on, which involved Andy Embler, Pucino does not indicate whether Embler and she were working on the same or a similar assignment at that time.  Pucino does concede that she was able to perform her job that day, albeit with more effort.

Based on this record, no jury could conclude that the handful of occasions in which Pucino may have been denied access to a tool "'created a materially significant disadvantage' in . . . [her] working conditions."  Beyer, 524 F.3d at 164 (quoting Williams, 368 F.3d at 128).  While Pucino may have been inconvenienced on these rare occasions, this conduct does not rise to the level of an adverse employment action.  Because of the absence of proof that the male comparators were similarly situated to Pucino, she likewise has not met her burden of demonstrating that this conduct gives rise to an inference of discrimination.

**B.**     **Pucino's Retaliation Claims**

In the Complaint and in her summary judgment opposition papers, Pucino asserts that Verizon retaliated against her by denying her light duty and thereby forcing

her to retire in December 2002, and that her supervisors and co-workers retaliated against

her by being hostile to her or engendering hostility against her.  (Pltf. Br. at 17-18 (citing

allegations concerning hostility as relevant to retaliation claim); Pltf. Br. at 33

(characterizing termination claim as retaliation claim); Cmplt. ¶¶ 24-27)  These claims

fail, either because they are untimely or because Pucino has not made out a prima facie

case.

     1.    **<u>Retaliatory Discharge</u>**

Like Dauer, Pucino did not present her retaliatory discharge claim to the

EEOC.  She also failed to allege in the Complaint a "specific linkage between filing [her]

EEOC charge and . . . [the] act of retaliation" – <u>i.e.</u>, her discharge.  <u>Alfano</u>, 294 F.3d at

382.  This failure is even more glaring in Pucino's case because – unlike Dauer –

Pucino's employment ended before Plaintiffs filed the Complaint.  Therefore, there is no

reason to excuse Pucino's failure to exhaust her administrative remedies.  (<u>See</u> <u>supra</u> pp.

35-36)

Moreover, Pucino has not established a prima facie case of retaliatory

discharge because she has not offered any evidence that could support a finding that "a

causal connection exists between the alleged adverse action and the protected activity."

<u>Schiano</u>, 445 F.3d at 608.  Like Dauer, she offers no direct proof of retaliatory animus or

of disparate treatment of similarly situated employees.  <u>McNair</u>, 160 F. Supp. 2d at 604;

<u>see also</u> <u>supra</u> pp. 29-30.  And as in Dauer's case, the year and a half that passed between

Verizon's receipt of her EEOC charge in April 2001 and her termination in December

2002 is too long a time period to give rise to an inference of retaliation.  <u>See, e.g.</u>,

<u>Gentile</u>, 509 F. Supp. 2d at 239 & n.9 (four months is too long); <u>Nicastro</u>, 60 F.Supp.2d

at 185 (three months is too long).  Therefore, Defendant is entitled to summary judgment

on Pucino's retaliatory discharge claim.

      **2.**      <u>**Retaliatory Hostility**</u>

      With respect to the alleged retaliatory hostility, Pucino offers the

following evidence (Pltf. Br. at 17-18):

> (1)    In 1998, after Pucino complained to a supervisor that she was not given light duty but a male employee was, the male employee was removed from light duty, and Pucino was accused by co-workers of "throwing him under the bus."  (Pucino Aff. ¶¶ 59-63)

> (2)    At an unspecified time after 1995, Pucino complained to a second-line manager that Hinspeter was harassing her.  The manager transferred her to a different supervisor.  A few weeks later, the new supervisor was transferred, and "Hinspeter began harassing Pucino even more."  (<u>Id.</u> ¶¶ 67-71)

> (3)    In "late 1998," after Pucino complained of gender discrimination through Verizon's internal EEO hotline, her supervisor announced her complaint to her co-workers and told them "they would now have to watch what they said and did."  (Pucino Aff. ¶¶ 64-65).  Two days later, Pucino found a 15-foot long dead black snake in her locked van.  (<u>Id.</u> ¶ 66; Pucino Dep. 113:25-115:18, 116-15-117:8)  While her co-workers were aware that Pucino was "extremely fearful of snakes," Pucino has no idea who put the snake in her van.[31]  (<u>Id.</u>)

Pucino has not offered evidence sufficient to establish a prima facie case of retaliation

with respect to any of these incidents.

      As to the 1998 incident, in which Pucino was accused of throwing her co-

worker "under the bus," Pucino's federal claim is not timely.  To the extent she could

------

[31]  It appears that at her deposition, Pucino claimed that the bases for her retaliation claim were, in addition to the snake incident, that:  (1) co-workers would not speak to her; (2) she was suspended for insubordination; and (3) she was "watched" by her supervisor. (Def. Br. at 21)  Pucino does not argue this conduct in her summary judgment opposition papers (Pltf. Br. at 17-18); accordingly, it is deemed abandoned.

assert such a claim under state law, it would fail on the merits, because the remarks involved in the incident fall under the category of "petty slights" that, as a matter of law, cannot support a retaliation claim.  White, 548 U.S. at 68.

As to the second incident, Pucino's only evidence is the conclusory statement that Hinspeter "began harassing . . . [her] even more" at some point after 1995. (Id. ¶¶ 67-71)  This statement is too conclusory to defeat summary judgment, and there is also no evidence that the alleged increased harassment occurred during a time period for which Pucino can sue.  See Holcomb, 521 F.3d at 137 (conclusory allegations insufficient to defeat summary judgment); Bickerstaff, 196 F.3d at 451-52 (same); Meiri, 759 F.2d at 998 (same).

The most troubling evidence concerns the "late 1998" snake incident, which would be timely only under state law.  However, Pucino has offered no evidence from which a jury could determine who put the snake in her van.  Although the Second Circuit has not directly addressed the issue of when an employer may be held liable for unlawful retaliatory conduct, other courts have concluded that under the general principles of vicarious liability applicable to Title VII claims, an employer may be liable for retaliatory conduct only if a supervisor participated in the conduct or if the employer knew or should have known about the conduct.  Abreu v. Suffolk County Police Dep't, No. 03-Civ.-5927(JFB)(WDW), 2007 WL 608331, at *12 (E.D.N.Y. Feb. 23, 2007) (observing that courts other than the Second Circuit "have generally concluded that employers are vicariously liable for retaliatory acts committed by supervisors"); Muraj v. UPS Freight Serv., No. 04-Civ.-6563(CJS), 2006 WL 2528538, at *3 (W.D.N.Y. Aug. 31, 2006) (applying "general principles of vicarious liability under Title VII" to

retaliation claim); <u>see also</u> <u>Dawson v. County of Westchester</u>, 351 F. Supp. 2d 176, 187-

88 (S.D.N.Y. 2004) (consistent with general agency principles, an employer is

vicariously liable for supervisors' conduct in creating a hostile work environment, and is

liable for a plaintiff's co-workers' conduct if it knew or reasonably should have known of

conduct and failed to take appropriate remedial action).  Pucino cannot establish,

however, that one of her colleagues put the snake in her van, much less that one of

Defendant's supervisors or managers put the snake in her van or knew or reasonably

should have known that this would happen.  Because there is no factual basis for a

finding against the Defendant here, Defendant is entitled to summary judgment on this

retaliation claim.

**C.      Pucino's Hostile Work Environment Claim**

Like Dauer, Pucino asserts a hostile work environment claim based on the

same evidence she offered in support of her disparate treatment claim.  To defeat

summary judgment, Pucino must demonstrate that her supervisors created an

environment that, when "considered as a whole, undermined [her] ability to perform [her]

job[], and compromis[ed her] status as equal[] to men in the workplace," <u>Dawson</u>, 373

F.3d at 274, and that they created this environment because of Pucino's sex.  <u>Patane</u>, 508

F.3d at 113.  Moreover, to support a hostile work environment claim, the alleged

"incidents must be more than episodic; they must be sufficiently continuous and

concerted in order to be deemed pervasive."  <u>Perry</u>, 115 F.3d at 149; <u>Ricks v. Conde Nast</u>

<u>Publications, Inc.</u>, 92 F. Supp. 2d 338, 348 (S.D.N.Y. 2000) ("Title VII requires more

than a merely 'episodic pattern' of offensive, discriminatory conduct.").  In attempting to

meet this standard, Pucino offers evidence that she repeatedly had negative encounters with two particular supervisors, Hinspeter and Moore.[32]

    **1.**    <u>**Pucino's Evidence**</u>

As described above, Pucino has offered evidence concerning Hinspeter's and/or Moore's alleged denial of assistance, of tools, of overtime, and of permission to use public bathrooms.  (<u>See</u> <u>supra</u> pp. 45-48, 52-55)  Pucino offers the following additional evidence of their hostile conduct toward her.

    **a.**    <u>**Denial of Light Duty**</u>

Pucino has offered evidence that in 1997 or 1998, she asked either Hinspeter or Moore for a light duty assignment, and was told that there is "[n]o such thing" and that the "[p]olicy had changed."  (Pucino Dep. 74:5-12, 75:21-22)  Supervisor

---

[32]  Although Pucino contends that a number of supervisors discriminated against her – including Al Burka, Justin Hinspeter, Kevin Moore and Bonnie Adonolfi (Pucino Dep. 96:18-97:4) – Pucino's evidence primarily concerns Hinspeter and Moore.  Pucino claims that Adonolfi violated her rights only with respect to denying light duty (Pucino Dep. 76:24-78:11), in an incident in which Hinspeter was also allegedly involved.  (<u>Id.</u> 77:16-24) (testifying that Adonolfi told Pucino that Adonolfi had to check with Hinspeter before responding to Pucino's request for light duty)).  Burka was Pucino's supervisor in the early 1990s (<u>id.</u> 80:22-24), long before the period for which Pucino can bring a claim, and there is no evidence connecting his alleged discriminatory conduct to the conduct alleged to have occurred in 1998 or later.

Although neither party has offered evidence that clearly establishes when the alleged hostile work environment existed, Pucino has offered evidence from which a jury could reasonably infer that this claim relates to the time period from 1995 through 2001. Pucino has offered evidence that Hinspeter and Moore were foremen at the Union Avenue Garage from 1995 through 2001, "except for certain short intervals in which they were transferred to other work sites."  Burton Aff. ¶ 3.  She has also offered evidence that their conduct affected her even when they did not directly supervise her, in that "[t]he foremen or supervisors in each garage all share one room or office and often supervise each other's work groups," and "even when Pucino was not assigned to Hinspeter's work group, he interacted with her."  (Irwin Aff. ¶¶ 5-6 (stating that in his capacity as a union official, he observed Hinspeter's treatment of Pucino while she worked in the Union Avenue garage))

Adonolfi later made similar statements to Pucino – apparently in December 2001 – after consulting with Hinspeter.  (Id. 76:24-78:11, 80:25-81:20)

           **b.**                **Other Allegedly Harassing Conduct**

        Pucino has offered several specific but isolated examples of negative treatment by Hinspeter and Moore.  For example, she testified that Hinspeter and Moore prohibited her co-workers from stopping for cold drinks between jobs and blamed Pucino for the new rule.  (Pucino Aff. ¶¶ 38-40)  She has also testified that when she complained of harassment through Defendant's internal hotline, Moore "told the garage that . . . [she] had called," and a few days later she found a 15-foot long dead black snake in her van.  (Pucino Dep. 113:25-115:18, 116:23-117:5; Pucino Aff. ¶¶ 64-66)

        Pucino has also offered evidence of more continuous and sustained negative treatment by Hinspeter and Moore.  For example, she testified that "[f]rom the time [she] transferred to the Union Avenue Garage in 1995, supervisor Hinspeter singled [her] out for intense scrutiny of [her] work and then criticize[d] [her] for incompetence in front of [her] male co-workers" (id. ¶ 34), and that "[e]verything [she] did" was criticized and that the criticism was "always" done in public.  (Pucino Dep. 111:23, 113:9-11)  Pucino also complains that "[t]he foreman . . . would say to everyone" that "Joan was at a job yesterday and she failed to do such and such a thing" (id. 113:2-8), and that she never heard criticism of a male employee.[33]  (Id. 113:12-14; see also Pucino Aff. ¶ 31-34)

        Pucino has also offered evidence that Hinspeter "pick[ed] on [her] constantly," calling her "stupid" and a "bitch" (Pucino Aff. ¶ 35), and told her to "go fuck

---

[33] Pucino admits, however, that she received positive performance reviews from both Hinspeter and Moore.  (Def. Rule 56.1 Stat. ¶ 47)

[her]self" on "many occasions."  (Pucino Dep. 119:2-5)[34]  A union representative has

offered testimony that "Hinspeter singled [Pucino] out for rougher, longer and more

vicious treatment than anyone else," and "was openly dismissive of Pucino's work and

used words such as 'just as productive as Joan' as an insult to the male workers."  (Irwin

Aff. ¶¶ 9-10)

       Further, Pucino has testified that Hinspeter and Moore followed her or

encouraged other supervisors to do so (Pucino Aff. ¶¶ 37, 42-45, 47-48), and that

"[d]uring the several periods" when Hinspeter was Pucino's supervisor, he "routinely

changed [her] work area for no apparent reason other than to harass [her]."  (Pucino Aff.

¶¶ 51-55)  When Pucino asked Hinspeter's supervisor to help end Hinspeter's harassing

behavior, Hinspeter "began harassing Pucino even more."  (Pucino Aff. ¶¶ 35, 67-71)

> **2.    Whether Pucino's Evidence Is Sufficient
> for a Jury To Find That Pucino Was
> <u>Subjected to a Hostile Work Environment</u>**

       Although Pucino has offered more evidence than Dauer of repeated

negative conduct by her two supervisors Hinspeter and Moore, she has not offered

sufficient evidence for a jury to find that her supervisors fostered a "workplace

atmosphere . . . [that] undermined [Pucino's] ability to perform [her] job[]," <u>Dawson</u>, 373

F.3d at 274, or that her supervisors "create[d] such an environment because of . . . [her]

sex," <u>Patane</u>, 508 F.3d at 112.

---

[34] Pucino, however, also told Hinspeter to "go fuck himself."  (<u>Id.</u> 118:3-6)

a.  **Whether There Is Evidence that the**
    **Conduct Occurred Because Of Pucino's Sex**

   Like Dauer, Pucino has not offered sufficient evidence for a jury to find

that her supervisors' alleged negative conduct was directed at her because of her sex.

Pucino's allegations that she was treated less favorably than male co-workers are entirely

conclusory and lack the "concrete particulars," Bickerstaff, 196 F.3d at 451-52, that

would permit a jury to find that she was treated differently from male employees who

were "similarly situated in all material respects."   Mandell, 316 F.3d at 379.  The only

specific evidence that Pucino presents concerns one incident – that occurred during seven

years of work at the Union Avenue garage – in which Hinspeter refused to give her a "B"

tool that he then provided to a male employee.  However, even with respect to that

incident, Pucino has not offered sufficient evidence for a jury to find that the male

employee was similarly situated in all material respects – e.g., that the male employee

had an equal or lesser need for the tool to perform the particular job he had been assigned

that day.  (See supra pp. 46-47, 55)

    Pucino's remaining evidence concerning discriminatory animus consists

of her affidavit testimony that Hinspeter would "pick on [her] constantly, calling [her]

'stupid,' [and] a 'bitch' and would tell [her] to 'go fuck [her]self.'"  (Pucino Aff. ¶ 35)

Courts have recognized that the term "bitch" is derogatory to women and its use may be

evidence of gender-based animus.  See Jackson v. New York City Dep't of Homeless

Servs., 501 F. Supp. 2d 496, 504-05 (S.D.N.Y. 2007).  However, the term is not

necessarily "an indication of a general misogynist attitude" and is not "particularly

probative of gender discrimination" when the evidence is that it was "directed toward

only one woman, rather than women in general," as is the case here.  Kriss v. Sprint

Commc'n Co., Ltd. P'ship, 58 F.3d 1276, 1281 (8th Cir. 1995); see also Yuknis v. First
Student, Inc., 481 F.3d 552, 555 (7th Cir. 2007) ("Context may be critical to determining
the object of hostility. . . . [A] gender-specific term of abuse . . . need not imply hostility
based on the abused person's sex."); Patenaude v. Salmon River Cent. Sch. Dist., No. 03-
Civ.-1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005) (court "must be careful
. . . not to make broad generalizations or assumptions based on the mere use of . . .
words" that have some gender-based connotation, such as "bitch," and should consider
whether words were used "because of . . . [the plaintiff's] gender or for some other
reason"); Jackson, 501 F. Supp. 2d at 504-05 (co-workers' use of the word "bitch" was
not "dispositive on its own," but jury could infer gender-based animus based on evidence
that co-workers also referred to plaintiff as a "ho" and plaintiff's supervisor told her she
would not be promoted because it was "not the right time" for a woman).

    Here, there is no evidence of gender-based animus other than the fact that
Hinspeter allegedly called Pucino a "bitch" and also used gender-neutral insults – e.g.,
he called Pucino "stupid" and told her to "go fuck [her]self" – a phrase Pucino admits she
used in speaking to Hinspeter.  (See supra p. 62 & n. 34)  Pucino has also offered
evidence that the workplace "culture . . . include[d] frequent rough give and take between
co-workers as well as supervisors" and that, in the opinion of a union official, she "fit in
well . . . and did not object to the atmosphere."  (Irwin Aff. ¶¶ 7-8)  Based on this
evidence, there is no rational basis for a jury to infer that Hinspeter's conduct toward

Pucino was motivated by gender-based animus[35] rather than personal dislike of Pucino.[36] Therefore, Pucino cannot establish the third element of her hostile work environment claim.  See Alfano, 294 F.3d at 378 (plaintiff could not proceed with claim against supervisor where jury could find that he "disliked . . . [her] personally, but there is no indication that he disliked her because she was a woman"); Bickerstaff, 196 F.3d at 448 (court must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture"); Nowak v. Lowe's Home Ctr., Inc., No. 05-Civ.-6273, 2007 WL 894214, at *5 (W.D.N.Y. March 21, 2007) (evidence could not give rise to inference of sex-based discrimination where supervisor called plaintiff a "bitch" once, but there was also evidence of a "personality conflict" between plaintiff and the supervisor).

### b.        Whether the Conduct Was Objectively Severe or Pervasive

In determining whether the "complained of conduct . . . is objectively severe or pervasive," Patane, 508 F.3d at 113, this Court must consider "the frequency of the discriminatory conduct; its severity; whether it [wa]s physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with . . . [Pucino's] work performance."  Schiano, 445 F.3d at 605 (internal quotation omitted).

---

[35]  Pucino has offered no evidence of gender-based animus on the part of the three other supervisors who she claims subjected her to gender-based harassment, including Kevin Moore.  (See supra n. 32)

[36]  While Hinspeter singled out Pucino by name – e.g., by making statements such as "just as productive as Joan" as an insult to other workers (Irwin Aff. ¶¶ 9-10) – there is no evidence that he singled out other women in this fashion or that he ever made any statements which attacked female workers generally.

With respect to the first factor, Pucino has offered evidence that some of the conduct about which she complains – i.e., the failure to provide assistance, the restrictions on using off-site bathrooms, the public criticism, and the changing of work assignments – were routine or happened frequently.

With respect to the second and third factors, most of the repeated, complained of conduct was not severe, physically threatening or humiliating.  As discussed above, the failure to provide assistance, the offsite bathroom policy, and the changing of work assignments, were at worst an inconvenience or an annoyance.  While the public criticism was not physically threatening, Pucino does claim that she found it humiliating.

With respect to the fourth factor, Pucino has not offered evidence that the complained of conduct unreasonably interfered with her work performance.  Indeed, she has not offered evidence showing that it interfered with her work performance at all.  For example, as discussed above, Pucino has not offered evidence showing that Defendant actually failed to provide assistance on an occasion when it was necessary to perform her job.  (See supra p. 47)  Nor can this Court find that the offsite bathroom policy, the changes in work assignments, or the public criticism unreasonably interfered with Pucino's work performance.

As noted in connection with Dauer's hostile work environment claim (see supra pp. 40-42), the cases Plaintiffs rely on – Raniola v. Bratton, 243 F.3d 610 (2d Cir. 2001) and Dawson v. County of Westchester, 373 F.3d 265 (2d Cir. 2004) – involve significantly more severe harassment than that at issue here.  While employers are not "free from liability in all but the most egregious of cases," Dawson, 373 F.3d at 273,

Pucino must still demonstrate that the complained of conduct undermined her ability to do her job. Based on this record, no rational jury could make such a finding. Accordingly, Defendant is entitled to summary judgment on Pucino's hostile work environment claim.

## CONCLUSION

For the foregoing reasons, Verizon's motion for summary judgment against Plaintiff Dauer (Docket No. 27) is GRANTED, and Verizon's motion for summary judgment against Plaintiff Pucino (Docket No. 24) is GRANTED. The Clerk of the Court is directed to close this case.

Dated: New York, New York
March 17, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge